LESLIE, Appellant,

v.

OHIO DEPARTMENT OF DEVELOPMENT, Appellee.

[Cite as *Leslie v. Ohio Dept. of Dev.*, 171 Ohio App.3d 55, 2007-Ohio-1170.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 06AP–628.

Decided March 15, 2007.

56

Mark A. Leslie, pro se.

Marc Dann, Attorney General, Jack W. Decker, and Sloan T. Spalding, for appellee.

McGRATH, Judge.

{¶ 1} Appellant, Mark A. Leslie, pro se, appeals from the judgment of the Franklin County Court of Common Pleas affirming an order of the State Personnel Board of Review ("SPBR") upholding appellant's termination from his employment with appellee, the Ohio Department of Development. For the following reasons, we affirm.

{¶ 2} On July 27, 2000, appellant, a licensed Ohio attorney, was hired as chief of compliance for the Ohio Housing Financing Agency ("OHFA") pursuant to a 30–day emergency appointment. The OHFA finances the acquisition, construction, and rehabilitation of safe, affordable housing to low- and moderate-income Ohioans through administration of various loan programs. At all relevant times, the OHFA was administratively housed within appellee and was principally staffed with employees of appellee.

{¶ 3} Appellant became a permanent employee of OHFA on August 22, 2000. Appellant's position was considered part of the OHFA administrative staff; accordingly, he was an unclassified employee.

{¶ 4} Appellant was supervised by and reported to appellee's chief legal counsel, Marlo Tannous. When the OHFA offices relocated to a building different from that which housed appellee, Rita Parise, OHFA Director of Planning, Preservation, and Development, assumed on-site supervisory responsibility for appellant; appellant continued, however, to report to Tannous for administrative purposes.

{¶ 5} As chief of compliance, appellant's job duties included providing a full range of legal advice and services to appellee with primary emphasis in drafting and negotiating loans for OHFA; developing and implementing legal policy for appellee; and drafting opinions and providing interpretation of the Ohio Revised Code, the Ohio Administrative Code, the Code of Federal Regulations, and any legal requirements governing appellee's programs. Tannous relied upon appel-

lant, as well as attorneys from the law firm of Peck, Shaffer and Williams, to provide legal expertise regarding OHFA activities.

{¶ 6} On August 18, 2000, shortly after commencing employment with appellee, appellant e-mailed Parise and Tannous inquiring about the statutory basis underlying the Equity Bridge Loan ("EBL") program, one of several loan programs administered by OHFA. Appellant was concerned that the type of loan OHFA extended and the form of collateral OHFA required for an EBL might be outside the scope of OHFA's statutory authority. In particular, appellant interpreted certain provisions of R.C. Chapter 175 as permitting OHFA to make loans directly to developers only when the loan was secured by a mortgage. Appellant noted that EBLs were made directly to developers but were not secured by a mortgage. Appellant requested assistance in locating written documentation regarding statutory authorization for the EBL program.

{¶ 7} Appellant reiterated his concerns in a memorandum he submitted to Tannous on August 29, 2000, and again in a file memorandum he drafted on October 24, 2000. On September 1, 2000, appellant issued a memorandum to Tannous, Parise, OHFA Executive Director Richard Everhart, OHFA Assistant Executive Director Bruce Velt, and OHFA Affordable Housing Loan Program Manager Karen Banyai proposing that OHFA more closely monitor compliance with EBL guidelines. On September 11, 2000, appellant proposed in a memorandum to Tannous, Parise, and Banyai that additional collateral and other requirements be made mandatory for EBLs made after January 1, 2001.

{¶ 8} After both Tannous and Parise attempted, unsuccessfully, to locate written documentation addressing the issue, they referred appellant to John Peck of the Peck law firm. The firm had worked with OHFA to initiate the EBL program in 1987 and ensure its legality. Appellant twice sent the October 24, 2000 file memorandum to Peck via facsimile; however, Peck did not respond. The record is unclear whether Peck ever discussed appellant's concerns with appellant or anyone else at OHFA.

{¶ 9} Appellant's job duties required him to consult regularly with Banyai. Initially, the two enjoyed a positive working relationship. At some point, however, the relationship disintegrated, as appellant, according to Banyai, was oftentimes uncooperative and difficult.

{¶ 10} Around the end of May 2001, appellant and his wife began having marital problems. On June 22, 2001, appellant asked Banyai to lunch. Banyai accepted the invitation because she saw it as an opportunity to improve her working relationship with appellant.

{¶ 11} During lunch, appellant discussed his marital issues and asked Banyai if he could see her socially. Banyai said she was not interested in dating but might

be willing to socialize as friends. The following Monday, June 25, 2001, the two had dinner together. Appellant discussed his marital situation and his religious beliefs and reiterated his desire for a personal relationship with Banyai. Banyai again stated she was not interested in dating.

{¶ 12} A few days later, appellant asked Banyai at work whether she had given any more thought to the possibility of dating him. Banyai responded that she had a personal policy of not dating recently divorced men or co-workers. About a week later, appellant asked her to reconsider her dating policy; Banyai responded that she would not.

{¶ 13} In July, August, and September 2001, appellant left several voicemail messages on Banyai's home telephone. Banyai did not return any of appellant's calls; in fact, she began screening all of her telephone calls because she did not want to talk to him.

{¶ 14} On September 18, 2001, appellant sent Banyai an e-mail at her home. He acknowledged violating the professional and emotional boundaries Banyai had established; nonetheless, he admitted his attraction to her and commented upon her physical appearance. He said he wanted to spend more time with her and get to know her on a nonprofessional level. Banyai did not respond to the e-mail; she found it unsettling, inappropriate and "creepy." Banyai told appellant at work the next day that she was not interested in a personal relationship.

{¶ 15} In late September 2001, appellant sent Banyai a birthday card; he also e-mailed her at home and at work, asking whether he could take her to dinner for her birthday. Banyai did not respond to either e-mail and did not acknowledge the birthday card. In early October 2001, appellant offered to assist Banyai with meals and errands after her foot surgery scheduled for later that month. Banyai declined the offer.

{¶ 16} Banyai shared her uneasiness about appellant's actions with a co-worker but was reluctant to report her concerns to Parise, her supervisor. However, in early October 2001, Banyai told Parise that she and appellant were involved in a work-related dispute. When Parise told Banyai to resolve the situation with appellant, Banyai stated that she was not comfortable doing so because appellant had been pressuring her to go on a date with him. Banyai declined Parise's offer to intervene, stating that she would handle the matter herself. Parise agreed to remain neutral but told Banyai that if she raised any more concerns about appellant, she would treat them as a complaint and take appropriate action.

{¶ 17} On Saturday, October 5, 2001, appellant appeared, uninvited, at Banyai's apartment complex. Banyai noticed appellant pulling into the parking lot as she was exiting. Banyai did not speak to appellant at the time; however, she

confronted him at work the next week, and he admitted he had been in the parking lot.

{¶ 18} Banyai was upset about the incident and reported it to Parise. On October 7, 2001, Parise, Tannous, and Human Resource Administrator Heather Cunningham met with appellant and informed him that his prior contact with Banyai was unwelcome, that he was not to have any personal communication with her by any means, either at home or at work, and that contact with her was to be limited to OHFA matters. This directive was not reduced to writing, and no formal disciplinary action was taken. Appellant indicated that he understood the admonition. Later that day, appellant left a voicemail message for Cunningham apologizing for his inappropriate behavior and assuring Cunningham that he would refrain from further personal contact with Banyai.

{¶ 19} In late November 2001, Banyai asked appellant about his Thanksgiving plans. Appellant said he was having dinner with family in Cincinnati; Banyai replied that she had no plans. On Thanksgiving, appellant telephoned Banyai at home and asked whether he could speak to her. Banyai refused, and appellant hung up. Banyai did not report the incident to Parise because she did not want to jeopardize her positive working relationship with appellant. Appellant, however, voluntarily reported the episode to Parise and Cunningham; both reiterated the admonition that he was not to have personal contact with Banyai.

{¶ 20} On January 4, 2002, appellant left copies of a newspaper article in Banyai's and Parise's mailboxes at work; the article concerned a prison ministry with which appellant was familiar. The copy appellant put in Parise's mailbox was apparently intended for Banyai, as it was addressed to "K.B." and included a handwritten note asking whether she knew anyone with a "warm heart" who would be willing to teach computer skills to inmates. Parise found the use of Banyai's initials and the handwritten note inappropriate and in violation of the established boundaries regarding contact with Banyai. A few days later, she verbally warned appellant that if he continued to disobey the directive concerning Banyai, she would take action against him.

{¶ 21} On January 24, 2002, appellant submitted a memorandum to Parise and Tannous recommending against proposed changes to a loan made to Elmer Woda Housing, L.L.C. and Woda Colonial Park Limited Partnership made under the Home Investments Partnership Program ("HOME"). HOME, a program developed by the United States Department of Housing and Urban Development ("HUD"), is administered in Ohio by OHFA. HUD regulations require administering states to submit a consolidated plan prior to receiving HOME funding; in addition, a participating state must amend its consolidated plan under certain prescribed circumstances. Appellant argued that certain changes to the Woda HOME loan contradicted the consolidated plan submitted to HUD and thus

required an amendment to the plan. Appellant also complained that Woda, a for-profit developer, was being given preferential treatment designed only for nonprofit developers.

{¶ 22} A few days later, on January 30, 2002, appellant submitted a memorandum to Tannous regarding a loan project, referred to within OHFA as West Tech, which involved rehabilitation of an old Cleveland high school into low-income apartment housing. Appellant stated that certain changes to the loan should have received approval from the OHFA Board or one of its subcommittees. In particular, appellant expressed concerns about inadequate collateral, an insufficient guarantee from the developer, an inadequate second mortgage for OHFA, and other risks of OHFA not receiving payment on its loan.

{¶ 23} On the same day, appellant sent a memorandum to Tannous complaining about a seed-money loan OHFA made to Victoria Place Limited Partnership. In particular, appellant argued that certain provisions of the Ohio Revised Code and the Ohio Administrative Code precluded seed-money loans to for-profit entities.

{¶ 24} On February 4, 2002, appellant e-mailed Parise, Tannous, and Kit Logsdon, the OHFA Director of Finance, regarding compensating balance loans ("CBLs"). In this type of loan, OHFA deposits funds into a lending institution. In return for use of the funds, the lending institution provides OHFA with interest payments that are then used by OHFA to defer or defray a developer's cost and debt burden on OHFA-approved housing project financing. Appellant's e-mail asserted that OHFA funds deposited in a particular lending institution were not sufficiently collateralized pursuant to statute.

{¶ 25} On the same day, Tannous and Cunningham met with appellant to address complaints that he was a "difficult" employee. Tannous and Cunningham suggested that appellant become more of a "team player." Cunningham also suggested that if he was unhappy working at OHFA, he was free to consider other options.

{¶ 26} In mid-February 2002, appellant invited Banyai to lunch with him and a co-worker. He also asked her whether he could send her a religious Valentine's Day card. Banyai declined both offers and warned him that such overtures violated the no-personal-contact order.

{¶ 27} On February 17, 2002, appellant called Banyai at home and asked whether he could speak to her about certain projects. Banyai reminded him that contacting her at home violated the no-personal-contact directive. Because she thought the projects to which appellant referred were work-related, she told him to call her at the office.

{¶ 28} The next day, appellant gave Banyai a packet of papers that included a flyer from a church on which appellant had written a note stating that the church

needed volunteers to set up a computer spreadsheet; the packet also included a coffee coupon and a blank form will, living will, and other advanced directives. Banyai showed the papers to Parise and expressed her fear appellant would never adhere to the no-personal-contact directive. Parise reported the matter to Tannous and Cunningham and the three met with Banyai; she said that she was becoming increasingly intimidated by appellant's actions and was considering obtaining a restraining order against him.

{¶ 29} On February 19, 2002, Parise, Cunningham, and Tannous met with appellant and asked him whether he had called Banyai at home and put the packet of papers in her mailbox; appellant admitted he had done so. Thereafter, appellant was excused from the meeting; Parise, Cunningham, and Tannous discussed the matter and concluded that appellant's continued disobedience of the no-personal-contact directive left appellee vulnerable to an action by Banyai for fostering a hostile work environment. Accordingly, the three concluded that appellant could no longer work at OHFA; since there were no comparable jobs available within appellee, termination was the only option.

{¶ 30} Immediately thereafter, Parise, Tannous, and Cunningham met with Everhart and Garver to discuss appellant's continued disobedience of directives to cease all personal contact with Banyai. The discussion also touched upon appellant's recent criticisms of OHFA business practices. Parise, Cunningham, and Tannous opined that the situation regarding appellant's behavior toward Banyai was not going to improve and that if no action was taken, appellee might be exposed to a lawsuit by Banyai. The group ultimately concluded that appellant should be fired for insubordination in failing to heed the directive imposed upon him regarding his behavior toward Banyai and for causing a difficult environment for Banyai.

{¶ 31} On March 1, 2002, Tannous, Cunningham, and Garver met with Director Bruce Johnson to discuss the situation. Johnson was informed only that appellant had engaged in unwelcome and intimidating behavior concerning a co-worker, had been instructed not to have any personal contact with that co-worker, and had been insubordinate in failing to follow those instructions. Johnson was not informed about appellant's prior communications regarding OHFA procedures.

{¶ 32} As a result of the meeting, Johnson drafted a letter notifying appellant that he was being terminated from his position effective March 1, 2002. Tannous and Cunningham met with appellant and presented him with the termination letter and a separation and release agreement. Appellant declined the option of resigning and was thereafter terminated.

{¶ 33} On March 29, 2002, appellant filed a notice of appeal with the SPBR, asserting that he had been terminated in retaliation for whistle-blowing activity in contravention of R.C. 124.341, which provides:

(A) If a state employee in the classified or unclassified civil service becomes aware in the course of his employment of a violation of state or federal statutes, rules, or regulations or the misuse of public resources, and the employee's supervisor or appointing authority has authority to correct the violation or misuse, the employee may filed a written report identifying the violation or misuse with his supervisor or appointing authority.

* * *

(B) Except as otherwise provided in division (C) of the section, no state officer or state employee shall take any disciplinary action against a state employee for making any report authorized by division (A) of this section, including, without limitation, doing any of the following:

(1) Removing or suspending the employee from employment;

* * *

(C) A state employee shall make reasonable effort to determine the accuracy of any information reported under division (A) of this section. * * *

(D) If an appointing authority takes any disciplinary or retaliatory action against a classified or unclassified employee as a result of the employee's having filed a report under division (A) of this section, the employee's sole and exclusive remedy, notwithstanding any other provision of law, is to file an appeal with the state personnel board of review within thirty days after receiving actual notice of the appointing authority's action. If the employee files such an appeal, the board shall immediately notify the employee's appointing authority and shall hear the appeal. The board may affirm or disaffirm the action of the appointing authority or may issue any other order as is appropriate. The order of the board is appealable in accordance with the provisions of Chapter 119. of the Revised Code.

{¶ 34} In April 2003, an administrative law judge ("ALJ") issued a procedural order establishing that appellant's R.C. 124.341 appeal would be governed by the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207, and their progeny. The ALJ set forth a detailed explanation of the order of presentation of evidence and the parties' respective burdens, as follows: Appellant would bear both the burden of proving a violation of R.C. 124.341 and the burden of production to establish, by a preponderance of the evidence, the elements of a prima facie case. To establish a prima facie case, appellant would be required to produce evidence that he complied with the requirements of R.C. 124.341 by filing

a written report with either his supervisor or appointing authority alleging a violation of state or federal statutes, rules, or regulations or the misuse of public resources, and that after he filed the report, the supervisor or appointing authority took disciplinary or retaliatory action as a result of the filing of the report (i.e., a causal relationship). If appellant succeeded in establishing a prima facie case, the burden of production would shift to appellee to establish, by a preponderance of the evidence, that it had a coinciding legitimate, nonretaliatory reason for its action against appellant. If appellee succeeded in its burden, the burden of production would shift back to appellant to rebut appellee's evidence of a legitimate reason for removal. Appellee would then have the opportunity to establish justification for its action by demonstrating that its coinciding action against appellant was, in fact, legitimate and more than a mere pretext for retaliation.

{¶ 35} Following a seven-day evidentiary hearing, the ALJ issued a written report and recommendation. The ALJ noted that appellant contended that he blew the whistle on appellee, via his e-mails and memoranda to Tannous, with regard to five areas of OHFA loan activities: (1) EBLs, (2) the West Tech loan, (3) the Victoria Place seed-money loan, (4) the Woda HOME loan, and (5) CBLs. The ALJ found that appellant had failed to establish a causal connection between his reporting in any of the five areas of loan activity and his termination. Accordingly, the ALJ concluded that appellant had failed to establish a prima facie case of whistle-blowing.

{¶ 36} Despite this conclusion, the ALJ addressed the second phase of the *McDonnell Douglas/Burdine* evidentiary framework. The ALJ concluded that appellee had met its burden of producing evidence that it had a legitimate, nonretaliatory reason for terminating appellant, i.e., creating and fostering an untenable environment for Banyai and failing to heed clear, legitimate instructions to cease that activity and that appellant had failed to successfully demonstrate that appellee's stated reason for its action was pretextual. Accordingly, the ALJ recommended that appellant's whistle-blower claim be dismissed.

{¶ 37} Appellant filed objections to the ALJ's report and recommendation. By order dated May 5, 2005, the SPBR adopted the ALJ's report and recommendation and dismissed the appeal.

{¶ 38} Appellant appealed the SBPR's order to the common pleas court. During those proceedings, appellant filed three separate motions for declaratory judgment. On May 31, 2006, the court issued a decision and entry denying appellant's motions for declaratory judgment and affirming in part, reversing in part, and remanding the matter to the SPBR with instructions.

{¶ 39} More particularly, the court found application of the *McDonnell Douglas/Burdine* evidentiary framework appropriate in a whistle-blower appeal

brought under R.C. 124.341. The court disagreed, however, with the SPBR's analysis as to whether appellant had established a prima facie case of whistle-blowing under R.C. 124.341. The court determined that appellant had established a prima face case with respect to four of the five areas of loan activity. The court agreed, however, that appellee had met its burden of producing evidence establishing a legitimate, nonretaliatory reason for terminating appellant and that appellant had failed to prove that appellee's explanation for its action was merely a pretext for retaliation. Accordingly, the court affirmed the SPBR's order to the extent that it found that appellee had terminated appellant due to his creation and continuation of an untenable environment for Banyai and due to his insubordination in failing to heed appellee's repeated directives to cease that activity. The court reversed the SPBR's order only to the extent that it found that appellant had failed to establish a prima facie case under R.C. 124.341. The court remanded the matter to the SPBR with instructions to enter an order affirming appellee's removal of appellant from his unclassified position of employment.

{¶ 40} Appellant filed a timely notice of appeal from the common pleas court's judgment. As noted by appellee, appellant's brief does not formally designate assignments of error as required by App.R. 16(A)(3). However, appellant's statement of issues adequately sets forth the matters upon which he seeks review. Accordingly, we will consider the statement of issues as assignments of error. See, e.g., *State v. Biggers*, Morgan App. No. 05 CA 1, 2005-Ohio-5956, 2005 WL 2995162, at ¶ 7; *Gustin v. Chaney*, Highland App. No. 05CA7, 2006-Ohio-1049, 2006 WL 552565, at ¶ 5, fn. 1. The issues advanced by appellant are as follows:

I. The common pleas court erred by applying the doctrine of res judicata to Leslie's allegations of unlawful conduct. As a result, the court disregarded reliable and probative evidence. The court's decision was not rendered in accordance with law.

II. The common pleas court erred by applying the McDonnell–Douglas/Burdine evidentiary procedure to Leslie's whistle-blower appeal under RC § 124.341. The court's decision was not rendered in accordance with law.

III. The common pleas court erred by denying Leslie's motions for declaratory judgment and declining to rule on Leslie's claims of unlawful conduct and of violation of his constitutional right of expression. The court's decision was not rendered in accordance with law.

IV. The common pleas court erred by ruling that appellee can assert an illegal motive as a sufficient excuse under RC § 124.341 so long as that motive is not retaliatory. The court's decision was not rendered in accordance with law.

V. The common pleas court erred in finding no evidence that Leslie's whistle blowing motivated his removal. The court abused its discretion by disregarding reliable, probative and substantial evidence.

VI. The common pleas court erred by labeling Leslie's actions as harassment when the legal standards for such determination had not been met. The court abused its discretion by ruling that such harassment was sufficient grounds for Leslie's removal.

VII. The common pleas court erred by finding that the federal court dismissed Leslie's state law claims. The court declined to rule on Leslie's Ohio Constitution claim of religious expression. The court's decision was not rendered in accordance with law.

VIII. The common pleas court erred in relying upon the federal court's decision regarding Leslie's first amendment claims. The court declined to rule on Leslie's Ohio Constitution claim of religious expression. The court's decision was not rendered in accordance with law.

IX. The common pleas court erred by declining to rule on Leslie's Ohio Constitution claim of religious expression, which was material and relevant to Leslie's case. The court's decision was not rendered in accordance with law.

{¶ 41} In addition, appellee asserts the following conditional cross-assignment of error:

The common pleas court erred in determining that Leslie demonstrated a *prima facie* case of whistle-blowing. No reasonable attorney in Leslie's position could have believed he was reporting a violation of state or federal statutes, rules or regulations or the misuse of public resources as required by R.C. § 124.341(A), nor did he reasonably investigate the same as required by R.C. § 124.341(C).

{¶ 42} Appellee did not file a notice of cross-appeal pursuant to App.R. 3(C). Accordingly, appellee's proposed assignment of error may be " 'considered only for the purpose of preventing a reversal of the judgment under review.' " *Jackson v. Columbus,* Franklin App. No. 05AP–1035, 2006-Ohio-5209, 2006 WL 2808172, at ¶ 8, quoting *Parton v. Weilnau* (1959), 169 Ohio St. 145, 170–171, 8 O.O.2d 134, 158 N.E.2d 719. See, also, R.C. 2505.22; *Knox v. Travelers Ins. Co.,* Franklin App. No. 02AP–28, 2002-Ohio-6958, 2002 WL 31819651, at ¶ 36; *Hunter v. BPS Guard Serv., Inc.* (1995), 100 Ohio App.3d 532, 654 N.E.2d 405. Accordingly, we will consider appellee's conditional cross-assignment of error only insofar as it provides an alternative basis for affirming the common pleas court's judgment, and not as a ground for reversal of that judgment. *Jackson,* supra.

{¶ 43} In an administrative appeal pursuant to R.C. 119.12, the common pleas court considers the entire record and determines whether the agency's

order is supported by reliable, probative, and substantial evidence and is in accordance with law. *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 110–111, 17 O.O.3d 65, 407 N.E.2d 1265. The common pleas court's "review of the administrative record is neither a trial *de novo* nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.' " *Lies v. Veterinary Med. Bd.* (1981), 2 Ohio App.3d 204, 207, 2 OBR 223, 441 N.E.2d 584, quoting *Andrews v. Bd. of Liquor Control* (1955), 164 Ohio St. 275, 280, 58 O.O. 51, 131 N.E.2d 390. Furthermore, even though the common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, the agency's findings are not conclusive. *Univ. of Cincinnati*, 63 Ohio St.2d at 111, 17 O.O.3d 65, 407 N.E.2d 1265.

 {¶ 44} On appeal to this court, the standard of review is more limited. Unlike the common pleas court, a court of appeals does not determine the weight of the evidence. *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.* (1992), 63 Ohio St.3d 705, 707, 590 N.E.2d 1240. In reviewing the common pleas court's determination that the agency's order was supported by reliable, probative, and substantial evidence, this court's role is limited to determining whether the common pleas court abused its discretion. *Roy v. Ohio State Med. Bd.* (1992), 80 Ohio App.3d 675, 680, 610 N.E.2d 562. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. However, on the question of whether the agency's order was in accordance with law, this court's review is plenary. *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 339, 343, 587 N.E.2d 835.

 {¶ 45} We will address appellant's nine assignments of error in an order that facilitates our analysis. Appellant's second assignment of error asserts that the common pleas court erred by applying the *McDonnell Douglas/Burdine* evidentiary formula to his whistle-blower appeal under R.C. 124.341. Appellant asserts that that evidentiary framework applies only to discrimination claims under R.C. 4112.02 and Section 1983, Title 42, U.S.Code.

{¶ 46} Appellant did not object to use of the *McDonnell Douglas/Burdine* framework at the administrative level. As noted, the ALJ's April 2003 procedural order expressly stated that the appeal would be governed by that framework and set forth a detailed blueprint of the evidentiary process to be employed at the hearing, including the parties' burdens of proof and production. Appellant moved for reconsideration of the order as to an unrelated issue; he did not object to use of the *McDonnell Douglas/Burdine* burden-shifting structure. The hearing was

conducted, without objection from either party, using the evidentiary framework set forth in the procedural order. Moreover, appellant did not raise the issue in his objections to the ALJ's report and recommendation.

{¶ 47} A party generally waives the right to appeal an issue that could have been but was not raised in earlier proceedings. *MacConnell v. Ohio Dept. of Commerce,* Franklin App. No. 04AP–433, 2005-Ohio-1960, 2005 WL 995590, at ¶ 21. This tenet has been applied in appeals from administrative agencies. Id. See, also, *Tipton v. Woltz,* Summit App. No. 22722, 2005-Ohio-6989, 2005 WL 3557133, at ¶ 8. ("The failure to raise an issue before an administrative board operates as a waiver of that issue later in the appeal process.") Because appellant failed to object to use of the *McDonnell Douglas/Burdine* evidentiary framework in response to the procedural order, at the hearing, or in his objections to the ALJ's report and recommendation, he waived the objection on appeal. The second assignment of error is overruled.

{¶ 48} Appellant's fifth assignment of error takes issue with the common pleas court's finding that "[t]here was no reliable, probative, and substantial evidence to support [appellant's] contention that his whistle-blowing motivated [appellee's] termination decision in any way." (May 31, 2006 Decision and Entry, at 22.) Appellant argues that the court ignored direct evidence establishing that his whistle-blowing reports were the primary cause of his discharge. More particularly, appellant asserts that a February 1, 2002 e-mail from Everhart to Parise and Tannous regarding appellant's January 30, 2002 memorandum about the seed-money loan "threaten[ed] consequences if [appellant] failed to stop second-guessing Parise." (Appellant's brief at 28.) Appellant also avers that "Cunningham[ ] threat[ened] [appellant's] future employment with the privatized OHFA because of his whistle-blower reports." Id. Finally, appellant states "Parise[ ] admit[ted] that [appellant's] reports were part of the reason for removing him." Id.

{¶ 49} As previously noted, in an R.C. 119.12 appeal the common pleas court is charged with assessing witness credibility, the probative nature of the evidence, and the weight thereof. The court apparently did not assign much weight or probative value to the evidence, and our review reveals that appellant completely mischaracterizes it. Although Everhart expressed dissatisfaction and frustration with appellant's legal analysis of the seed-money loan program, he did not "threaten consequences" regarding appellant's employment. Parise testified that Everhart did not discuss terminating appellant at that time. Moreover, Cunningham did not threaten appellant's future employment with OHFA; she merely made him aware that he had choices regarding his employment with OHFA should OHFA become independent of appellee. In addition, Tannous expressly testified that Cunningham never threatened appellant's future employment with

OHFA. Finally, Parise did not testify that appellant's reports were a "substantial consideration" in the decision to terminate him; she stated only that the February 19, 2002 meeting with Garver and Everhart included a "general discussion" about appellant's argumentative demeanor and memoranda criticizing OHFA's business dealings. She further averred that the discussion regarding appellant's termination focused on his repeated disregard of the directives regarding Banyai.

{¶ 50} Moreover, Cunningham testified there was no discussion of terminating appellant until after he admitted in mid-February that he had contacted Banyai in contravention of written directives prohibiting such action. Further, Parise, Tannous and Cunningham testified that the decision to terminate appellant was based solely upon his insubordinate behavior in repeatedly disregarding the directive to cease personal contact with Banyai. Also, Johnson averred that he was informed only that appellant had engaged in unwelcome and intimidating behavior concerning a co-worker, had been instructed not to have any personal contact with that co-worker, and had been insubordinate in failing to follow those instructions; he was not made aware of appellant's communications regarding OHFA procedures. We concur in the common pleas court's ultimate conclusion that no reliable, probative, and substantial evidence supported appellant's contention that his whistle-blowing motivated appellee's decision to terminate his employment. The fifth assignment of error is overruled.

{¶ 51} Appellant's sixth assignment of error challenges the common pleas court's use of the term "harassment" in characterizing appellant's behavior toward Banyai. Appellant argues that the term is typically used by a court to describe "the cumulative effect of abusive discrimination by an employee as measured by the legal criteria constituting a 'hostile work environment.'" (Appellant's brief, at 29.) Appellant maintains that the court did not identify how appellant's actions met the "extremely stringent criteria for determining 'hostile work environment' applicable to the actions of a nonsupervisory co-worker" as adopted by Ohio courts and the United States Supreme Court. (Id.)

{¶ 52} Appellant attaches legal significance to the court's use of the term "harassment" where none was intended. The decision does not suggest that the court employed the term in any legal sense, whether in connection with a "hostile work environment" or otherwise. In our view, the court used the term only in the vernacular as a shorthand means of describing appellant's conduct regarding Banyai. Indeed, the term "harass" means "to disturb persistently; * * * bother continually; [or] pester." Webster's Encyclopedic Unabridged Dictionary of the English Language (1997), 645. The court could easily have employed any one of these synonyms to illustrate appellant's actions toward Banyai. Because the court employed the term "harassment" only in the vernacular, it was not required

to identify how appellant's actions met the legal criteria of a "hostile work environment."

{¶ 53} Further, appellant's "harassment" of Banyai was only one of two asserted reasons for terminating him. Appellee's witnesses all agreed that appellant was removed for insubordination in disregarding repeated warnings to cease personal contact with Banyai. Appellant's assertion that he could be removed for insubordination only if he violated a written policy against harassment is unavailing. An unclassified public employee generally may be terminated for any reason. *Hooper v. Univ. of Cincinnati* (May 25, 2000), Franklin App. No. 99AP–727, 2000 WL 674909, citing *Eudela v. Ohio Dept. of Mental Health & Mental Retardation* (1986), 30 Ohio App.3d 113, 114, 30 OBR 213, 506 N.E.2d 947. The sixth assignment of error is overruled.

{¶ 54} Appellant's fourth, seventh, eighth, and ninth assignments of error are interrelated and will be considered jointly. Together they assert that appellee's so-called legitimate, nonretaliatory reason for terminating his employment, i.e., his harassment of Banyai and concomitant insubordination in failing to follow directives to cease that activity, violated his right to free expression of religion under Section 7, Article I, Ohio Constitution. Appellant contends that appellee's decision to terminate him directly resulted from his religious communications to Banyai. Appellant contends that such unlawful action by an employer cannot serve as a legitimate reason for disciplinary action under the *McDonnell Douglas/Burdine* evidentiary model as applied to an R.C. 124.341 appeal. Appellant contends that the common pleas court did not adequately or properly address this issue.

{¶ 55} Appellant argued before the common pleas court that to determine whether the SPBR's action was in "accordance with law," the court was required to examine the "legitimate, nonretaliatory" reason for the discipline imposed by appellee and determine whether the reason was unlawful or unconstitutional. Appellee responded that from a strictly civil service perspective, appellee could terminate appellant, an unclassified employee, for any reason other than whistle-blowing. Appellee argued that any other claims for unlawful termination that appellant might assert (e.g., violations of state and/or federal constitutions) would lie outside an R.C. 119.12 appeal.

{¶ 56} The court adopted appellee's position on this issue. In addition, the court noted that appellant had filed an action in federal court asserting a Section 1983, Title 42 U.S.Code claim for violation of his First and Fourteenth Amendment rights, an R.C. Chapter 4112 claim for religious discrimination and retaliation, and a claim for wrongful discharge. See *Leslie v. Johnson* (Mar. 14, 2006), S.D.Ohio No. 2:04–CV–0080, 2006 WL 745770. The common pleas court noted

that the federal court had dismissed appellant's state law claims and granted summary judgment to the defendants on his federal claims.

{¶ 57} The court further stated, however, that it agreed with appellant's contention that the federal court decision did not preclude it from performing its duty under R.C. 119.12 to review the record and determine whether the SPBR's decision was supported by the requisite evidence and was in accordance with law. To that end, the court averred that to the extent it had jurisdiction to analyze the lawfulness of appellee's actions outside the whistle-blower context, it adopted the federal court's findings. More particularly, the court found that the federal court had correctly applied First Amendment law to public employees using the balancing test created by the United States Supreme Court in *Pickering v. Bd. of Edn. of Twp. High School Dist. 205, Will Cty., Illinois* (1968), 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811. The court noted that the federal court assumed appellant's speech was about a matter of public concern and went on to analyze whether his interest as a citizen commenting upon public matters outweighed appellee's interest in advancing the efficiency of the public services it performs through its employees. The court further noted that the federal court found that the balancing test favored appellee, i.e., appellee was justified in placing restrictions on appellant's speech because it disrupted the efficient, effective operation of appellee's business.

{¶ 58} The common pleas court also rejected appellant's contention that his termination was related to constitutionally protected speech or religious communications. In so finding, the court stated that the federal court had noted that appellant's speech was interfering with the efficient operation of appellee. In addition, the court found nothing in the record to suggest that the religious content of appellant's speech was the cause of his termination.

{¶ 59} We need not address whether the common pleas court erred in adopting appellee's position that in an R.C. 124.341 appeal, an employee may be terminated for any reason other than whistle-blowing regardless of whether that other reason is unlawful. In addition, we disagree that the common pleas court "summarily rejected without discussion [appellant's] contention that his removal implicated his constitutional rights of religious expression." (Appellant's brief, at 32.) As noted, the court disagreed with appellant's contention that his termination was motivated by constitutionally protected religious communications. The record fully supports this conclusion. Appellee did not forbid appellant only to have religious communications with Banyai; it also forbade him to have any non-business-related communication with her. Further, at least two of appellee's admonitions resulted from appellant's actions that had nothing to do with religious expression. Indeed, the initial directive resulted from appellant's uninvited appearance at Banyai's apartment complex; the November 2001 re-

newed warning followed appellant's telephone call to Banyai on Thanksgiving. In short, the evidence does not suggest that the religious content of appellant's communications with Banyai was pertinent to appellee's decision to terminate his employment. Accordingly, we cannot find that appellee's stated reason for removing appellant was unlawful. Accordingly, appellant's fourth, seventh, eighth, and ninth assignments of error are overruled.

{¶ 60} Appellant's first and third assignments of error are interrelated and will be considered together. Appellant contends that the common pleas court erred in denying his three motions for declaratory judgment. Appellant's first motion sought a declaration that OHFA's actions in the five areas of loan activity that were the subject of his alleged whistle-blower memoranda were unlawful. His second motion requested a declaration that the ALJ and SPBR improperly applied the *McDonnell Douglas/Burdine* evidentiary configuration to his R.C. 124.341 appeal. The third motion asked the court to declare that the directive imposed in October 2001 unlawfully abridged his right to religious expression under the Ohio Constitution.

{¶ 61} As to the first motion, the court determined that in an R.C. 124.341 appeal, it is irrelevant whether violations alleged in a written report made under R.C. 124.341(A) constitute actual violations of state or federal statutes, rules, or regulations or the misuse of public resources. The court further found that appellant was barred by the doctrine of res judicata from raising the issue because the Ohio Supreme Court had previously ruled, in an appeal of a mandamus action brought by appellant against OHFA, that appellant lacked standing to challenge the lawfulness of OHFA's programs and policies. *State ex rel. Leslie v. Ohio Hous. Fin. Agency* (2005), 105 Ohio St.3d 261, 270, 824 N.E.2d 990. As to the second and third motions, the court determined that because its review of the SPBR order under R.C. 119.12 included a determination whether the order was in accordance with law, appellant's attempt to raise the issues via a motion for declaratory judgment was improper.

{¶ 62} Declaratory judgment is improper when there are sufficient administrative remedies to resolve an issue that does not involve the validity or constitutionality of a statute. *Fairview Gen. Hosp. v. Fletcher* (1992), 63 Ohio St.3d 146, 149, 586 N.E.2d 80. Appellant's motions do not challenge the validity or constitutionality of a statute. Accordingly, appellant's motions for declaratory judgment are procedurally improper.

{¶ 63} Further, as to the first motion, we agree with the common pleas court's conclusion that a determination whether appellee actually violated a state or federal statute, rule, or regulation or misused public resources is unnecessary under R.C. 124.341. See, e.g., *Fox v. Bowling Green* (1996), 76 Ohio St.3d 534,

668 N.E.2d 898 (construing R.C. 4113.52, Ohio's general private employee whistle-blower statute). Finally, we have already addressed the issues raised in the second and third motions; accordingly, they are moot. The first and third assignments of error are overruled.

{¶ 64} Appellee's conditional cross-assignment of error challenges the common pleas court's conclusion that appellant established a prima facie case of whistle-blowing. However, since the judgment of the common pleas court is to be affirmed, it is not necessary to consider appellee's conditional cross-assignment of error. Accordingly, appellee's conditional cross-assignment of error is moot.

{¶ 65} For the foregoing reasons, appellant's nine assignments of error are overruled, appellee's conditional cross-assignment of error is moot, and the judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

SADLER, P.J., and BRYANT, J., concur.