[Cite as *Hawkins v. Ohio Dept. Natural Resources*, 2023-Ohio-3493.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Judson J. Hawkins et al., | : | |
| Appellants-Appellants, | : | No. 22AP-689 |
| | | (C.P.C. No. 20CV-3321) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio Department of Natural Resources, | : | |
| Appellee-Appellee. | : | |

D E C I S I O N

Rendered on September 28, 2023

**On brief:** *Judson J. Hawkins*, pro se.  **Argued:** *Judson J. Hawkins*.

**On brief:** *Dave Yost*, Attorney General, *Brian A. Ball*, and *Gene Park*, for appellee.  **Argued:** *Brian A. Ball*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1}  Appellants, Judson J. Hawkins and Mary M. Hawkins ("the Hawkinses"), appeal from a judgment of the Franklin County Court of Common Pleas affirming an adjudication order issued by the director of appellee, the Ohio Department of Natural Resources ("ODNR"), concluding that a portion of the Hawkinses' real property is located within a Lake Erie Coastal Erosion Area ("Lake Erie CEA").  For the reasons that follow, we affirm.

I. Facts and Procedural History

{¶ 2}  In January 2018, ODNR notified the Hawkinses it had preliminarily identified their property in Eastlake, Ohio, as being within a Lake Erie CEA.  The Hawkinses filed a written objection with ODNR, asserting their property had not lost any ground to erosion despite a rise in the water level of Lake Erie since 1998.  ODNR Geology Program

Supervisor Mark Oxner-Jones visited the Hawkinses' property on June 7, 2018. Following that visit, ODNR sent the Hawkinses a letter confirming that a portion of their property was in a Lake Erie CEA.

{¶ 3} The Hawkinses filed an administrative appeal and requested a hearing, which was held on August 12, 2019.[1] Mary testified that Judson had purchased the property in October 1990 and that the couple had made extensive alterations to the existing two-bedroom cottage on the property that were completed in March 1993. During the construction, the Hawkinses installed vertical and horizontal drainage pipes to reduce erosion caused by the flow of surface water. As of March 1993, the portion of the property adjacent to Lake Erie consisted of "a horizontal surface of approximately 150 feet from the house and then there was a rather abrupt bluff leading to about a 40 or 50-foot beach before you entered the water." (Aug. 12, 2019 Tr. at 17.) In autumn 1998, the Hawkinses had a portion of their yard and bluff excavated and graded to improve lake access, resulting in a "walkable slope" at a "1 to 8 ratio."[2] (Aug. 12, 2019 Tr. at 17-18.) As part of that modification, approximately 480 tons of "anchor stone" was placed at the bottom of the slope to maintain the correct ratio. (Aug. 12, 2019 Tr. at 24.) Additional anchor stone was installed on three occasions beginning around 2010. Eventually, the Hawkinses had 11 large concrete blocks weighing approximately 38,000 pounds each installed to secure the anchor stone and prevent it from being pulled into Lake Erie. The area bounded by the large concrete blocks extended onto the neighboring property to the west, with permission from the Hawkinses' neighbor. Mary testified she walked the property and observed the bluff line "[a]lmost daily" and had not seen any erosion, but she acknowledged that ODNR claimed there had been 1 foot of erosion between 2005 and 2014. (Aug. 12, 2019 Tr. at 43.) She further testified that the owners of the two neighboring properties to the west had done nothing to protect their property from erosion during the 24 years the Hawkinses lived at the property.

---

[1] Prior to filing their administrative appeal, the Hawkinses filed a premature appeal in the Franklin County Court of Common Pleas that was ultimately dismissed for failure to exhaust administrative remedies. *Hawkins v. Ohio Dept. of Natural Resources*, Franklin C.P. No. 19CV-455 (May 6, 2019) (dismissal order).

[2] Although her testimony was not entirely clear, it appears Mary was referring to a ratio of 1 foot in elevation decline for every 8 feet of horizontal run.

{¶ 4} Oxner-Jones testified that for the 2018 Lake Erie CEA designation, ODNR identified areas anticipated to have 14 or more feet of shoreline recession during the next 30 years. In accordance with a procedure set forth in the Ohio Administrative Code, shoreline recession at the Hawkinses' property was measured along a transect, identified as transect number 360-13, located at approximately the midpoint of the property. The landform chosen for measurement along transect 360-13 was the crest of the bluff on the Hawkinses' property. During ODNR's original calculations, the Hawkinses' property was measured to have had 2.5 feet of shoreline recession between 2004 and 2015. After visiting the Hawkinses' property, Oxner-Jones made a small adjustment to the mapping, resulting in a measurement of 1.1 feet of shoreline recession on the Hawkinses' property. This constituted approximately 1/10 of a foot of shoreline recession per year from 2004 to 2015. Over the same period, the neighboring properties to the east had no shoreline recession, while the neighboring property immediately to the west had approximately 34.9 feet of shoreline recession and the next western property had 16.1 feet of shoreline recession. Applying a center-weighted moving average calculation to determine anticipated shoreline recession, ODNR estimated the transect on the Hawkinses' property would have 26.5 feet of recession over the next 30 years.[3] Oxner-Jones explained that under this center-weighted moving average calculation, the Hawkinses' property was "included in the coastal erosion area because a certain amount of recission * * * ha[d] been measured to the west" of their property.[4] (Aug. 12, 2019 Tr. at 194.)

{¶ 5} John Matricardi, a civil engineer hired by the Hawkinses, testified that in his opinion the anchor stone and concrete blocks placed on the Hawkinses' property were adequate to last 30 years and would prevent the Hawkinses' shoreline from receding more

---

[3] ODNR's "Final 2018 CEA Map Data Sheet," which was introduced as an exhibit at the hearing, included the following values for the transect located on the Hawkinses' property (360-13) and the two neighboring transects on either side:

| Transect number | Measured recession distance | Recession rate | Anticipated recession distance |
|---|---|---|---|
| 360-11 | 0.0 | 0.0 | 1.3 |
| 360-12 | 0.0 | 0.0 | 8.0 |
| 360-13 | 1.1 | 0.1 | 26.5 |
| 360-14 | 34.9 | 3.2 | 52.0 |
| 360-15 | 16.1 | 1.5 | 53.1 |

[4] Oxner-Jones testified the Hawkinses' property had been identified as being within a Lake Erie CEA during the prior round of mapping conducted in 2010. Mary testified she was unaware of any prior Lake Erie CEA designation.

than 14 feet over the next 30 years. Matricardi conceded ODNR correctly applied the procedure set forth in the Ohio Administrative Code for making the Lake Erie CEA determinations, but argued an exception should have applied to the Hawkinses' property because the measures they took extended beyond their property boundary. Matricardi also conceded the possibility of flanking erosion on the western side of the Hawkinses' property, but asserted it would not cause more than 14 feet of shoreline recession.

{¶ 6} The hearing officer issued a report and recommendation finding, based on the evidence presented at the hearing, that the northern 20 to 25 percent of the Hawkinses' property, which did not include their house, had been identified as being within a Lake Erie CEA. The report further found that although only 1.1 feet of shoreline recession had occurred on the Hawkinses' property between 2004 and 2015, the property immediately to the west had experienced 34.9 feet of recession and the next westernmost property had experienced 16.1 feet of recession over the same time span. The hearing officer found there was evidence that the erosion at the western neighboring properties was likely to continue and potentially flank the Hawkinses anchor stone and concrete blocks, causing shoreline recession on the Hawkinses' property. Because of the recession on the western neighboring properties, under the center-weighted moving average calculation applied by ODNR, 26.5 feet of future recession was predicted for the transect on the Hawkinses' property. The hearing officer concluded that the governing statutes and rules did not provide for individual exceptions from a Lake Erie CEA designation. The hearing officer further concluded that the Hawkinses failed to establish by the preponderance of the evidence that ODNR erred in applying the statutes or rules and finding a portion of their property to be within a Lake Erie CEA. The hearing officer recommended that the director affirm ODNR's action to include the northern portion of the Hawkinses' property in the final identification of the Lake Erie CEA.

{¶ 7} The Hawkinses filed a written objection to the hearing officer's report and recommendation, incorporating by reference the arguments asserted in their trial brief and closing argument. On May 14, 2020, the director of ODNR issued an adjudication order approving and confirming the hearing officer's report and recommendation, with minor spelling, typographical, and grammatical corrections.

{¶ 8} The Hawkinses appealed the director's order to the Franklin County Court of Common Pleas, asserting error in four of the hearing officer's conclusions of law. The court conducted a hearing on the appeal on October 9, 2020. The common pleas court issued a decision and final judgment on October 18, 2022 affirming the director's order. The court found there was reliable, probative, and substantial evidence to support ODNR's determination that a portion of the Hawkinses' property was within a Lake Erie CEA. The court further found ODNR correctly and accurately followed the statutory and regulatory procedure when making that determination and rejected the Hawkinses' claim that the order violated their constitutional rights.

## II. Assignments of Error

{¶ 9} The Hawkinses appeal and assign the following four assignments of error for our review:

> [I.] The term "due deference" means deference when appropriate. A decision by an executive agency is not entitled to "due deference" when it is unsupported by the facts and the law, and a trial court in affirming such a decision errs prejudicially.
>
> [II.] R.C. 1506.06(A) requires that successful efforts to prevent loss of property to erosion entitle an individual property owner to an exception from his property being included within a designated coastal erosion area.
>
> [III.] An administrative agency's rules must conform to the statutory mandates. It's [sic] interpretation of its own rules is not entitled to deference by an appellate court when the rules violate statutory mandates, and the recognition by a litigant that the agency will follow its own rules is not a concession that those rules are applied in a lawful manner.
>
> [IV.] An individual lake front property owner has a constitutionally guaranteed right to protect and maintain his shoreline including the right to recover land lost to avulsion in the absence of any hazard to the public trust.

## III. Analysis

## A. Standard of review

{¶ 10} A party adversely affected by the final identification of a Lake Erie CEA may appeal under R.C. Chapter 119. R.C. 1506.08. In an appeal under R.C. 119.12, the common

pleas court reviews the entire record to determine whether an agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. *Watkins v. Ohio Bd. of Edn.*, 10th Dist. No. 22AP-694, 2023-Ohio-2595, ¶ 16. Evidence is reliable when it can be confidently trusted and has a reasonable probability of being true, probative when it tends to prove the issue in question and is relevant to determining the issue, and substantial when it has importance and value. *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992).

{¶ 11} On appeal to this court, we review for abuse of discretion a common pleas court's determination that an agency's order was supported by reliable, probative, and substantial evidence. *Watkins* at ¶ 17. An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "However, 'on the question of whether the agency's order was in accordance with law, this court's review is plenary.' " *Watkins* at ¶ 17, quoting *Leslie v. Ohio Dept. of Dev.*, 171 Ohio App.3d 55, 2007-Ohio-1170, ¶ 44 (10th Dist.).

## B. Whether ODNR complied with the statutory requirements in identifying Lake Erie CEAs

{¶ 12} The gravamen of the Hawkinses' appeal is set forth in their second and third assignments of error, in which they claim ODNR failed to comply with R.C. 1506.06 in designating a portion of their property as a Lake Erie CEA. The Hawkinses argue there was no evidence their property would have more than 14 feet of actual shoreline recession over the next 30 years, and they were only included within a Lake Erie CEA because of the center-weighted moving average calculation used by ODNR to estimate anticipated shoreline recession. The Hawkinses argue ODNR failed to comply with R.C. 1506.06 because its method of identifying Lake Erie CEAs did not account for the erosion-reducing effect of the anchor stone and concrete blocks placed on their property.

## 1. Creation of the Lake Erie coastal management program and determination of Lake Erie CEAs

{¶ 13} The General Assembly created the Lake Erie coastal management program in 1988, and subsequently amended the program in 1994 and 1996. Am.Sub.S.B. No. 70, 142 Ohio Laws, Part I, 120; Am.Sub.S.B. No. 182, 145 Ohio Laws, Part I, 1868; Am.Sub.H.B. No. 119, 146 Ohio Laws, Part I, 1971. Under the coastal management program, the director of

ODNR is required to identify Lake Erie CEAs, "which are the land areas anticipated to be lost by Lake Erie-related erosion within a thirty-year period if no additional approved erosion control measures are completed within that time." R.C. 1506.06(A).

{¶ 14} ODNR must first make a preliminary identification of Lake Erie CEAs, using "the best available scientific records, data, and analyses of shoreline recession" and "tak[ing] into account areas where substantial filling, protective measures, or naturally stable land has significantly reduced recession." R.C. 1506.06(A). The preliminary identifications are then published, and each affected landowner is notified by certified mail. R.C. 1506.06(A). A landowner affected by a preliminary identification of a Lake Erie CEA may file a written objection with the director of ODNR that includes "verifiable evidence or documentation * * * that some portion of a Lake Erie coastal erosion area should not have been included in the areas defined by the preliminary identification." R.C. 1506.06(A). The director of ODNR must review all written objections and may modify the preliminary identification; the director must then make a final identification of Lake Erie CEAs. R.C. 1506.06(B) through (D). ODNR must review and may revise the identification of Lake Erie CEAs at least once every ten years, "taking into account any recent natural or artificially induced changes affecting anticipated recession." R.C. 1506.06(E).

{¶ 15} The process ODNR uses for identifying Lake Erie CEAs is set forth in Ohio Adm.Code 1501-6-10 through 13. Using currently available imagery, ODNR creates base maps of the Lake Erie shoreline. Ohio Adm.Code 1501-6-11(A)(1).[5] ODNR then compares the base maps to historical maps to determine the annual rate at which the shoreline has moved landward due to erosion, i.e., shoreline recession.[6] Shoreline recession is measured

---

[5] Ohio Adm.Code. 1501-6-11(A)(1) provides:

> Base maps shall be constructed using the most currently available imagery. Types of base-map imagery may include, but are not limited to, aerial photographs, remote sensing imagery, digital data, or some combination thereof. Criteria used to select base-map imagery shall include, but are not limited to, complete synoptic coverage of the Ohio shore where the shore is centrally located on the images, adequate geographic reference points, and resolution that is adequate to map a base recession line and identify cultural and physiographic features on the imagery.

[6] The historical imagery used to determine recession may be selected from 10 to 30 years prior to the year of the base map. Ohio Adm.Code 1501-6-11(A)(4). "For each transect, the annual recession rate in feet per year shall be calculated by dividing the measured recession distance by the time period in years between the recession lines." Ohio Adm.Code 1501-6-11(C).

at uniformly spaced points along transects that are perpendicular to the base recession line. Ohio Adm.Code 1501-6-11(B).[7] The annual shoreline recession rate is then used to calculate an anticipated recession distance over the next 30 years along each transect. For the 2018 Lake Erie CEA identification, ODNR measured annual shoreline recession along 14,175 transects spaced 100 feet apart.[8]

{¶ 16} ODNR applies a "center-weighted moving average" calculation to determine the anticipated recession distance along each transect. Ohio Adm.Code 1501-6-12. In this calculation, the recession distance at the subject transect is averaged together with the recession distances at each of the two neighboring transects on either side. The recession distance at the subject transect is weighted by a factor of 5, the recession distances for the transects on either side of the subject transect are weighted by a factor of 3, and the recession distances for the next outer transects are weighted by a factor of 1. Ohio Adm.Code 1501-6-12. During the 2018 calculations, ODNR designated as Lake Erie CEAs those areas found to have an anticipated recession distance of 14 feet or more over the next 30 years.

{¶ 17} A person who has received written notice that all or part of a parcel of real property is within a Lake Erie CEA may not sell or transfer their interest in that property without disclosing that fact to a buyer. R.C. 1506.06(F). No permanent structure that lies or will lie, in whole or in part, on land within a Lake Erie CEA can be erected, constructed, or redeveloped without a permit issued by ODNR. R.C. 1506.07(B);[9] Ohio Adm.Code 1501-6-22(A).

---

[7] Ohio Adm.Code 1501-6-11(B) provides:

> Recession distances shall be measured at points uniformly spaced along the base recession line. The recession distance at each point shall be measured from the base recession line along a transect oriented at a right angle to the general trend of the base recession line * * *. Each transect shall be uniquely identified and the measured recession distance shall be recorded and used to calculate the annual recession rate."

[8] Oxner-Jones testified that the transects used when determining the recession rate were established in the early 1990s.

[9] R.C. 1506.07(B) provides:

**2. Identification of a Lake Erie CEA on the Hawkinses' property**

{¶ 18} Based on the ODNR maps and Oxner-Jones's visit, the Hawkinses' property was determined to have experienced 1.1 feet of shoreline recession between 2004 and 2015, an annual recession rate of 0.1 feet per year. The two transects immediately to the east of the Hawkinses' property each had no shoreline recession, while the two transects immediately to the west had 34.9 feet (3.2 feet per year) and 16.1 feet (1.5 feet per year) of recession, respectively. Applying the center-weighted moving average calculation set forth in Ohio Adm.Code 1501-6-12, this resulted in an anticipated shoreline recession distance at the transect located on the Hawkinses' property of 26.5 feet over the next 30 years. Because this exceeded the 14-foot recession threshold, ODNR designated a Lake Erie CEA on the northern portion of the Hawkinses' property.

**3. Whether ODNR's determination of Lake Erie CEAs complies with the statutory requirements**

{¶ 19} The Hawkinses argue that ODNR's method of identifying Lake Erie CEAs, as applied to their property, fails to comply with the requirement under R.C. 1506.06(A) that

---

No person shall erect, construct, or redevelop a permanent structure on land within a Lake Erie coastal erosion area without a permit issued in accordance with rules adopted under [R.C. 1506.07(A)]. The director shall grant a permit under those rules if the proposed site is protected by an effective erosion control measure approved by the director that will protect the permanent structure or if both of the following criteria are met:

(1) The structure will be movable or will be situated as far landward as applicable zoning resolutions or ordinances permit;

(2) The person seeking the authorization will suffer exceptional hardship if the authorization is not given.

The approval of an effective erosion control measure by the director for the purposes of this division does not create liability on the part of the director, the department of natural resources, or the state, municipal corporation, county, or township regarding the future protection of the site for which the measure was approved.

The director shall not require a permit for the erection, construction, or redevelopment of a permanent structure on any parcel of property within a Lake Erie coastal erosion area if that property is not adjacent to Lake Erie.

For purposes of R.C. Chapter 1506, "[p]ermanent structure" is defined as "any residential, commercial, industrial, institutional, or agricultural building, any mobile home as defined in [R.C. 4501.01(C)], any manufactured home as defined in [R.C. 3781.06(C)(4)], and any septic system that receives sewage from a single-family, two-family, or three-family dwelling, but does not include any recreational vehicle as defined in [R.C. 4501.01]." R.C. 1506.01(F). "Erosion control structure" is defined as "a structure that is designed solely and specifically to reduce or control erosion of the shore along or near Lake Erie, including, without limitation, revetments, seawalls, bulkheads, certain breakwaters, and similar structures." R.C. 1506.01(L).

ODNR "shall take into account areas where substantial filling, protective measures, or naturally stable land has significantly reduced recession." The Hawkinses assert ODNR "never made any attempts, scientific or otherwise, to take into account the effect the stone placed by [the Hawkinses] would have on erosion as mandated by R.C. 1506.06(A)." (Appellants' Brief at 35.) The Hawkinses further argue there was no evidence to establish their property would have more than 14 feet of shoreline recession over the ensuing 30-year period.

{¶ 20} At the administrative hearing, Matricardi testified that ODNR's method for determining Lake Erie CEAs did not account for the effect of the Hawkinses' anchor stone and concrete blocks, which extended onto the adjacent property. Contrary to Matricardi's testimony, however, Oxner-Jones explained that ODNR's process accounted for the effect of protective measures such as those taken by the Hawkinses through the selection of the point used to measure the recession distance:

> Q: [I]n your interpretation of the rules, do those rules take into consideration that mandate that's in the statute?
>
> A: I think we do.
>
> Q: How do they do that?
>
> A: They do that by how we pick the recession feature. That's the feature along the transect that we use to monitor bluff retreat. If the history of erosion at that property is such that we see that that property is stable, we will pick a recession feature that reflects that.
>
> In the case of the Hawkins property, we chose the same recession feature for all three rounds of maps. It was always the crest of the bluff. So by choosing that same recession feature each time, that was taking into account the observed stability at that property.
>
> Q: And indirectly, whatever measures that were taken by the property owners to achieve that particular measurement point, is that what you're saying?
>
> A: Exactly. To the extent they put something in front of their property that increased its stability and that stability is reflected in the stability of the bluff crest and we picked that bluff crest, then in the process of picking that bluff crest, our

> mapping is reflecting the effect of whatever measures they put
> in.

(Aug. 12, 2019 Tr. at 208-09.) This testimony, which the hearing officer found to be credible and relied on in his decision, establishes that ODNR's method was designed to comply with the statutory requirement of accounting for protective measures taken to reduce shoreline recession.

{¶ 21} The Hawkinses further argue that the common pleas court's decision *Turtle Bay Ltd. Partnership v. Ohio Dept. of Natural Resources*, Franklin C.P. No. 00CVF06-5493 (Apr. 11, 2001), establishes that a landowner is entitled to an individual exception from a Lake Erie CEA designation based on the effectiveness of erosion control measures. However, *Turtle Bay* involved a different factual scenario presenting the question of when ODNR is required to consider the effectiveness of erosion control measures. The *Turtle Bay* case arose from a challenge to a Lake Erie CEA identification made in 1996, which was based on ODNR's comparison of shoreline maps from 1973 to 1990 to determine annual and anticipated shoreline recession rates. A landowner appealed a Lake Erie CEA designation, arguing ODNR failed to comply with R.C. 1506.06 because it did not consider the effect of an erosion control structure erected in 1996. The common pleas court ultimately affirmed ODNR's designation of the property as being within a Lake Erie CEA because it concluded that R.C. 1506.06 required ODNR to consider "what historic effect structures built during the period studied have had in order to anticipate what future recession will occur." *Turtle Bay* at 4. Because the structure in question had been built after the mapping used to determine recession rates, ODNR had no historic basis to consider the effect of the structure. The court concluded the structure constructed in 1996 would be considered in the next round of Lake Erie CEA determinations once ODNR had historical data reflecting its actual effect, at which point the designation could be removed if the structure was successful in reducing shoreline erosion. Thus, contrary to the Hawkinses' claim, the *Turtle Bay* decision did not hold that ODNR must grant individual exceptions to a Lake Erie CEA designation. Rather, the court concluded that under R.C. 1506.06, ODNR must consider the actual effect of erosion control measures based on historical data.

{¶ 22} The General Assembly has mandated that ODNR identify Lake Erie CEAs using "the best available scientific records, data, and analyses of shoreline recession." R.C. 1506.06(A). Oxner-Jones testified that the center-weighted moving average calculation set forth in Ohio Adm.Code 1506-6-12 was selected by a working group during the original process of coastal erosion area mapping in the 1990s because it "was found to most closely predict recessioning characteristics that matches what we see on the Lake Erie shoreline." (Aug. 12, 2019 Tr. at 207-08.) The Hawkinses have not presented any evidence to establish that the center-weighted moving average used by ODNR is not the "best available" scientific method to analyze shoreline recession. Rather, the Hawkinses argue they are entitled to an individual exception from ODNR's method of calculating Lake Erie CEAs due to the purported effectiveness of their erosion control measures. The Hawkinses object to ODNR's use of the center-weighted averaging method, which has the effect of considering erosion occurring on neighboring properties when determining anticipated shoreline recession on the Hawkinses' property. However, R.C. 1506.06 does not require ODNR to measure shoreline recession based on individual property boundaries nor does it prohibit the use of averaging across property boundaries in determining anticipated shoreline recession. Instead, R.C 1506.06 requires ODNR to "take into account areas where substantial filling, protective measures, or naturally stable land has significantly reduced recession." Oxner-Jones's testimony establishes that ODNR satisfied this statutory mandate through the selection of the recession feature used to measure shoreline recession. Nothing in R.C. 1506.06 requires ODNR to grant individual exceptions to properties that are found to be within Lake Erie CEAs. Accordingly, we reject the Hawkinses' argument that ODNR failed to comply with R.C. 1506.06 and overrule their second and third assignments of error.

## C. Whether the Lake Erie CEA designation infringed the Hawkinses' constitutional rights

{¶ 23} In their fourth assignment of error, the Hawkinses assert that ODNR's refusal to grant an exception from the Lake Erie CEA designation violated their constitutional rights. As explained above, we conclude that R.C. 1506.06 does not provide for an individual exception for a property that is determined to be within a Lake Erie CEA. The Hawkinses argue that the lack of an individual exception violates their constitutional rights.

{¶ 24} The Supreme Court of Ohio has held that a regularly enacted statute " 'is presumed to be constitutional and is therefore entitled to the benefit of every presumption in favor of its constitutionality.' " *Roosevelt Properties Co. v. Kinney*, 12 Ohio St.3d 7, 13 (1984), quoting *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 147 (1955). *See State v. Grevious*, ___ Ohio St.3d ___, 2022-Ohio-4361, ¶ 9 ("As always, we begin our review of a statute with the presumption that it is constitutional."). This presumption "applies equally to administrative regulations." *Kinney* at 13. *See Burneson v. Ohio State Racing Comm.*, 10th Dist. No. 03AP-925, 2004-Ohio-3313, ¶ 36 (citing *Kinney* and stating that courts accord legislatively authorized regulations a strong presumption of constitutionality). Before a statute may be declared unconstitutional, it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible. *Buckeye Inst. v. Kilgore*, 10th Dist. No. 21AP-193, 2021-Ohio-4196, ¶ 18.

{¶ 25} "Ohio has always considered the right of property to be a fundamental right." *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, ¶ 38. Article I, Section 1 of the Ohio Constitution declares that all people have certain inalienable rights, including "acquiring, possessing, and protecting property." Article I, Section 19 further declares that "[p]rivate property shall ever be held inviolate, but subservient to the public welfare." "There can be no doubt that the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces." *Norwood* at ¶ 38.

{¶ 26} The Hawkinses do not claim that the Lake Erie CEA designation constitutes a taking of their property; accordingly, we do not address that question here. Rather, citing *State ex rel. Merrill v. Ohio Dept. of Natural Resources*, 130 Ohio St.3d 30, 2011-Ohio-4612, the Hawkinses argue they have a right to recover land lost to erosion and, by extension, a right to an exception from inclusion within a Lake Erie CEA. At issue in *Merrill* was the determination of "the proper boundary between property abutting Lake Erie owned by private individuals and the territory of Lake Erie held in trust by the state for all Ohioans." *Merrill* at ¶ 1. As to that issue, the court concluded "the territory of Lake Erie, held in trust by the state of Ohio for the people of the state, extends to the natural shoreline, which is the line at which the water usually stands when free from disturbing causes." *Id.* at ¶ 63.

{¶ 27} Although the *Merrill* decision generally recognized that property rights are fundamental and strongly protected by the Ohio Constitution, the Hawkinses fail to establish how those general principles entitle them to an exception from a Lake Erie CEA designation. In an aside, the *Merrill* decision noted that the parties to the case agreed that artificial fill could not extend a littoral owner's property except where a littoral owner reclaimed land stripped away due to sudden changes caused by avulsion. *Id*. at ¶ 58. That was not part of the holding of the case and the court expressly stated that it "need not further comment on or clarify the effect of [accretion or erosion] on the property line." *Id*. Moreover, even if *Merrill* could be construed to recognize a constitutional right to reclaim land lost due to erosion or to protect property from erosion, the Hawkinses fail to establish why that would necessarily entitle them to an exception from inclusion within a Lake Erie CEA. Because the Hawkinses fail to demonstrate that the statute and regulations are clearly incompatible with their constitutional property rights, we reject the Hawkinses' constitutional argument and overrule their fourth assignment of error.

## D. Whether the common pleas court applied appropriate deference in its review

{¶ 28} Finally, we turn to the Hawkinses' first assignment of error, in which they argue the common pleas court gave excessive deference to the director's order. The Hawkinses claim the common pleas court erred by concluding it was unable to make factual findings or determine the credibility of witnesses. They further argue the common pleas court erred by stating that courts typically defer to an administrative agency's interpretation of its own rules.

{¶ 29} With respect to its standard of review for factual issues, the common pleas court correctly stated that its role was not to make factual findings or determine the credibility of witnesses. *See Physician's Ambulance Serv., Inc. v. Ohio Dept. of Medicaid*, 10th Dist. No. 20AP-32, 2020-Ohio-6842, ¶ 45 ("In an R.C. 119.12 appeal, the court of common pleas must give due deference to the administrative resolution of evidentiary conflicts, and where the agency's decision is supported by sufficient evidence and the law, the common pleas court lacks authority to reverse the agency's exercise of discretion even if its decision is admittedly harsh."); *Gardenhire v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 19AP-54, 2019-Ohio-4331, ¶ 9 ("Review by the common pleas court is neither a trial de

novo nor an appeal on questions of law only, but a hybrid review in which the court must assess the evidence regarding the credibility of witnesses and the probative value of the evidence. While the common pleas court will give due deference to the administrative agency's resolution of evidentiary conflicts, the factual findings of the agency are not conclusive before the common pleas court." (Citations omitted.)); *Westlake v. Ohio Dept. of Agriculture*, 10th Dist. No. 08AP-71, 2008-Ohio-4422, ¶ 13 ("Although the trial court must necessarily weigh the evidence presented to the administrative agency and, to a limited extent, may re-evaluate the credibility of the evidence, it must give due deference to the administrative determination of conflicting testimony, including the resolution of credibility conflicts.").

{¶ 30} With respect to deference to ODNR's interpretation of its own regulations, the common pleas court stated that courts typically defer to an agency's interpretation of its own rules and regulations when that interpretation is consistent with statutory law and the plain language of the rule. After the common pleas court issued its decision in this case, the Supreme Court clarified the scope of judicial deference to administrative agencies under Ohio law. *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, ___ Ohio St.3d ___, 2022-Ohio-4677. In *TWISM*, the court rejected mandatory deference, holding "it is never mandatory for a court to defer to the judgment of an administrative agency." *Id.* at ¶ 42. Instead, the court embraced permissive deference, holding that a court could consider an administrative interpretation when evaluating an ambiguous text and that the weight given to the administrative interpretation should depend on the persuasive power of that interpretation. *Id.* at ¶ 44-45. In this case, the common pleas court considered the relevant statutory and regulatory provisions and concluded ODNR correctly and accurately followed those provisions and that there was reliable, probative, and substantial evidence to support ODNR's determination. Based on our review of the decision, we do not find the common pleas court gave mandatory deference to ODNR's interpretation of the statutes or regulations in making that determination. Thus, although the common pleas court's decision cited pre-*TWISM*

language, the court did not err in its application of the law.[10]  Accordingly, we overrule the Hawkinses' first assignment of error.

## IV. Conclusion

{¶ 31} For the foregoing reasons, we overrule the Hawkinses' four assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, P.J., and JAMISON, J., concur.

---

[10] The Hawkinses also argue ODNR's decision was not in accordance with law because it incorrectly found they had not obtained permits to install the anchor stone and concrete blocks. The Hawkinses argue no permits were required for the placement of anchor stone or concrete blocks on their property. Although the Hawkinses argue this issue at length, we conclude it is not relevant. The hearing officer's report and recommendation, as adopted by the director of ODNR, concluded that the "erosion control measures implemented by the Hawkins on their property were not approved in accordance with former R.C. 1507.04, former R.C. 1521.22 and/or current R.C. 1506.40." (Report & Recommendation at 46.) Notwithstanding that conclusion, however, the report and recommendation further concluded that in applying the regulations, "ODNR nonetheless takes into account the effects of erosion control measures, even if not approved, on property along Lake Erie by basing its selection of the recession feature used to monitor bluff retreat on the erosion history of the property." (Report & Recommendation at 46-47.) Thus, denying the Hawkinses an exception from the Lake Erie CEA designation did not turn on whether the Hawkinses had obtained permits to install the anchor stone and concrete blocks. Rather, as explained in the report and recommendation, a portion of the Hawkinses' property was included within a Lake Erie CEA because, even accounting for the effect of the anchor stone and concrete blocks, their property was anticipated to exceed the shoreline recession threshold.