[Cite as *JG Ohio, L.L.C. v. Ohio Dept. of Commerce*, 2024-Ohio-5066.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

JG Ohio LLC,                                     :

      Appellant-Appellant,              :

                                      No. 23AP-435
v.                                              :        (C.P.C. No. 21CV-639)

State of Ohio, Department of Commerce,    :        (REGULAR CALENDAR)

      Appellee-Appellee.                :

---

D E C I S I O N

Rendered on October 22, 2024

---

**On brief:** *Loevy & Loevy*, *Frank Newell*, and *Mike Kanovitz*; *The Law Office of Michele L. Berry, LLC*, and *Michele L. Berry*, for appellant. **Argued:** *Frank Newell.*

**On brief:** *Dave Yost*, Attorney General, and *Daniel J. Martin*, for appellee. **Argued:** *Daniel J. Martin.*

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Appellant, JG Ohio, LLC ("JG"), appeals from a judgment of the Franklin County Court of Common Pleas affirming an order issued by appellee, Ohio Department of Commerce ("the Department"), denying JG's application for a medical marijuana processor provisional license. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} In 2016, the General Assembly created the Ohio Medical Marijuana Control Program.[1] 2016 Sub.H.B. No. 523; R.C. 3796.02. Pursuant to R.C. 3796.02, the Department is responsible for licensure of medical marijuana processors. The Department has promulgated rules, contained in Ohio Adm.Code Chapter 3796:3, to govern the licensure and operations of medical marijuana processors.

{¶ 3} The Department was authorized to issue up to 40 processor provisional licenses during the initial licensure period. Ohio Adm.Code 3796:3-1-01(A). An applicant for a processor license was required to submit a non-refundable application fee, a business plan, an operations plan, a quality assurance plan, a security plan, and a financial plan. Ohio Adm.Code. 3796:3-1-02(B). Applicants' plans were required to meet minimum requirements set forth in the rules. Ohio Adm.Code. 3796:3-1-02(B). Applications were to be ranked using an "impartial and numerical process" based on certain criteria related to each of the plans. Ohio Adm.Code 3796:3-1-03(B). The rules provided that "[a] provisional license shall be issued to the qualified applicant receiving at least the minimum required score in each category and the highest total score overall as compared to the other applicants." Ohio Adm.Code 3796:3-1-04(A).

### A. Request for applications and scoring of applications

{¶ 4} The Department issued a request for applications for processor provisional licenses. The application was divided into two sections; the first part was a "pass/fail" portion assessing whether an applicant satisfied the mandatory qualification criteria, and the second part was a scored portion assessing an applicant's business, operations, quality assurance, security, and financial plans. The business plan was worth up to 10 points, the operations plan was worth up to 30 points, the quality assurance plan was worth up to 30 points, the security plan was worth up to 20 points, and the financial plan was worth up to 10 points. Applicants were required to achieve a minimum total score of 60 points and a

---

[1] As originally enacted, responsibility for administering the Ohio Medical Marijuana Control Program was divided between the Department and the Ohio Board of Pharmacy. 2016 Sub.H.B. No. 523; *JG City*, *L.L.C. v. State Bd. of Pharmacy*, 10th Dist. No. 21AP-38, 2021-Ohio-4624, ¶ 2. The General Assembly amended R.C. 3796.02 in 2023, creating a Division of Marijuana Control within the Department and giving that division sole responsibility for administering the program. 2023 Am.Sub.H.B. No. 33. Licensure of medical marijuana processors was always within the purview of the Department; therefore, the change to R.C. 3796.02 does not affect this appeal.

minimum score for each scored plan (6 points each for the business and financial plans, 12 points for the security plan, and 18 points each for the operations and quality assurance plans) to be eligible for a processor provisional license.  The Department used three-person teams to score each plan—i.e., there was a business scoring team, an operations scoring team, a quality assurance scoring team, a security scoring team, and a financial scoring team.  The scoring teams used standardized score sheets developed by the Department to determine whether applicants' plans satisfied the scoring criteria.

{¶ 5}    The Department received 104 applications for processor provisional licenses, including the application JG filed on December 14, 2017.  JG scored 10 points for its business plan, 21 points for its operations plan, 21 points for its quality assurance plan, 0 points for its security plan, and 10 points for its financial plan.

{¶ 6}    Of the 104 applications the Department received, only 14 obtained the required minimum score on each of the five plans evaluated in the scored part of the application.  JG's application failed to meet the minimum score requirement because JG received 0 points for its security plan.  Therefore, JG was not eligible for a processor provisional license based on its initial application.

**B. Security plan clarification request and scoring**

{¶ 7}    Because fewer than 40 applicants met the minimum score requirements, in October 2018, the Department sent a clarification request to the applicants that had not met the minimum required score for the security plan, including JG.  The clarification request required an applicant to affirm that it would comply with certain provisions of the Ohio Revised Code and submit a revised facility plot plan.  The clarification request provided that an applicant's score on the security plan clarification would supersede its prior security plan score.

{¶ 8}    Security plan clarification submissions were scored as follows: 4 points were granted for making the required affirmation and the plot plans were evaluated for compliance with 8 specified criteria.  Two points would be awarded for each criteria that was met; thus, 16 points were available on the scored portion if all 8 criteria were satisfied.

{¶ 9}    JG submitted a security plan clarification, which received a total score of 12 points—4 points for making the required affirmations and 8 points for satisfying 4 of the 8 scored criteria required for the plot plan.  After the security plan clarification phase, JG had

a total overall score of 148.00.[2]   The lowest-ranking applicant receiving a processor provisional license had a total overall application score of 148.40.  Because JG's application was not within the top 40 qualifying scores, the Department gave JG notice of intent to deny its application for a medical marijuana processor license.

## C. Administrative hearing

{¶ 10} JG requested a hearing on the notice of intent to deny its application.  Prior to the hearing, JG issued subpoenas on the Department and members of the scoring teams. JG also requested the issuance of subpoenas to the entities that received processor provisional licenses (the "winning applicants") seeking testimony and production of unredacted portions of the winning applicants' applications.

{¶ 11} The Department moved to quash the subpoenas issued to individuals who were not part of the scoring teams for the operations, quality assurance, or security plans. The Department argued that because JG received perfect scores on its business and financial plans it could not gain additional points by demonstrating error in those scores. Therefore, the Department argued, only the members of the scoring teams for the operations, quality assurance, or security plans could give testimony relevant to JG's appeal.  The Department also filed a motion in limine requesting an order limiting JG from introducing any evidence or testimony concerning any other applicant for a processor provisional license.

{¶ 12} Prior to the hearing, the hearing officer issued an order noting that JG had withdrawn the subpoenas issued to individuals who were not members of the operations, quality assurance, or security scoring teams.  The order also quashed the subpoenas requested for the winning applicants.

{¶ 13} The hearing on JG's appeal was conducted over three days, from December 4 to December 6, 2019.  JG called five witnesses to testify at the hearing: Elizabeth Bailik, Paul Schad, Terri Gerhardt, Daniel Kenny, and Sheri Zapadka.  Bailik, a plans examiner in the Department's Division of Industrial Compliance, served as the team leader for the security scoring team.  Bailik and her team scored the security plan component of the 104 initial applications and scored the security plan clarifications submitted in response to the

---

[2] The Department applied a weighting calculation to applicants' scores, as specified in the request for applications; therefore, JG's total application score was different from the sum total of its individual plan scores.

Department's clarification request. Bailik testified at length regarding the scoring of JG's security plan clarification. Schad, a compliance specialist with the Ohio Board of Pharmacy, was a member of the operations scoring team and testified regarding the scoring of JG's operations plan. Gerhardt, the chief of the Division of Food Safety at the Ohio Department of Agriculture, Kenny, the chief of the Division of Plant Health at the Ohio Department of Agriculture, and Zapadka, a compliance specialist at the Ohio Board of Pharmacy, constituted the quality assurance scoring team and testified regarding the scoring of JG's quality assurance plan.

{¶ 14} Following the hearing, the hearing officer issued a report and recommendation recommending that JG's application for a provisional processor license be denied. The hearing officer concluded that JG failed to demonstrate that a change in its scores based on a closer evaluation of its application was warranted. The hearing officer further concluded that JG failed to demonstrate by a preponderance of the evidence that it was entitled to a change to its score that would improve the ranking of its application.

{¶ 15} JG submitted objections to the hearing officer's report and recommendation, asserting it should have received higher scores for its security, quality assurance, and operations plans, and that it should have been provided unredacted copies of the applications submitted by winning applicants. On January 14, 2021, the director of the Department issued a final order denying JG's application for a provisional processor license. The final order approved and incorporated by reference the hearing officer's report and recommendation.

## D. Appeal to the court of common pleas

{¶ 16} Pursuant to R.C. 119.12, JG appealed the Department's final order denying its application for a provisional processor license to the Franklin County Court of Common Pleas. JG asserted the Department's final order was not supported by reliable, probative, and substantial evidence, and was not in accordance with law. JG argued the Department erred in the scores it gave for JG's security plan and quality assurance plan.[3] JG also argued the hearing officer erred by quashing its subpoenas for portions of the applications submitted by the winning applicants.

---

[3] We note that although JG challenged the score for its operations plan in its objections to the hearing officer's report and recommendation, it did not raise a challenge to the operations plan score in its appeal to the common pleas court or the present appeal.

{¶ 17} The common pleas court affirmed the Department's final order, finding the testimony of the scoring team members constituted reliable, probative, and substantial evidence to support the hearing officer's conclusion that JG was not entitled to a change in the score its application received. The common pleas court also concluded that the hearing officer did not err by quashing the subpoenas requested for the winning applicants and by excluding the applications of the winning applicants from evidence.

## II. Assignments of Error

{¶ 18} JG appeals and assigns the following four assignments of error for our review:

> I. The common pleas court erred in ruling that the Ohio Department of Commerce's order denying Appellant's application for a marijuana processor license was supported by reliable, probative, and substantial evidence and in accordance with law pursuant to R.C. 119.12 with respect to the scoring of Criteria 1 of the clarification scoring process as it applied to the Security section of JG Ohio LLC's application.

> II. The common pleas court erred in ruling that the Ohio Department of Commerce's order denying Appellant's application for marijuana processor license was supported by reliable, probative, and substantial evidence and in accordance with law pursuant to R.C. 119.12 with respect to the scoring of Criteria 8 of the clarification scoring process as it applied to the Security section of JG Ohio LLC's application.

> III. The common pleas court erred in ruling that the Ohio Department of Commerce's order denying Appellant's application for marijuana processor license was supported by reliable, probative, and substantial evidence and in accordance with law pursuant to R.C. 119.12 with respect to the scoring of the "Disposal methods that will not pose a contamination risk" criteria as it applied to the Quality Assurance section of JG Ohio LLC's application.

> IV. The common pleas court erred in affirming the Hearing Examiner's ruling to deny JG Ohio LLC's request for unredacted copies of winning applications for a marijuana processor license.

## III. Discussion

### A. Standard of review

{¶ 19} Review and challenge of a medical marijuana control program licensure decision is pursuant to R.C. Chapter 119. *Solomon Cultivation Corp. v. Ohio Dept. of Commerce*, 10th Dist. No. 20AP-175, 2021-Ohio-46, ¶ 5. In an appeal under R.C. 119.12, the common pleas court reviews the entire record to determine whether an agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law.[4] *Watkins v. Ohio Bd. of Edn.*, 10th Dist. No. 22AP-694, 2023-Ohio-2595, ¶ 16. Evidence is reliable when it can be confidently trusted and has a reasonable probability of being true, probative when it tends to prove the issue in question and is relevant to determining the issue, and substantial when it has importance and value. *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992). The common pleas court's review "is neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court must assess the evidence regarding the credibility of witnesses and the probative value of the evidence." *Gardenhire v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 19AP-54, 2019-Ohio-4331, ¶ 9.

{¶ 20} On appeal to this court, we review for abuse of discretion a common pleas court's determination that an agency's order was supported by reliable, probative, and substantial evidence. *Watkins* at ¶ 17. "Absent an abuse of discretion on the part of the trial court, an appellate court may not substitute its judgment for the judgment of the agency or a trial court." *Id.* "However, 'on the question of whether the agency's order was in accordance with law, this court's review is plenary.' " *Id.*, quoting *Leslie v. Ohio Dept. of Dev.*, 171 Ohio App.3d 55, 2007-Ohio-1170, ¶ 44.

{¶ 21} An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable, but there is no discretion to commit an error of law. *See Mangan v.*

---

[4] At oral argument, JG suggested the common pleas court applied the wrong standard of review based on its citation of the "some evidence" standard in *Harris v. Lewis*, 69 Ohio St.2d 577 (1982). This court has held that merely citing *Harris* for the "some evidence" standard "does not demonstrate that the trial court employed an incorrect standard of review" in an administrative appeal. *Bennett v. State Med. Bd. of Ohio*, 10th Dist. No. 10AP-833, 2011-Ohio-3158, ¶ 15. In *Bennett*, we concluded that notwithstanding the citation to *Harris*, the common pleas court also cited and applied the correct standard of review. *Id.* Similarly, in this case, in addition to citing the "some evidence" in *Harris*, the common pleas court also cited the "supported by reliable, probative, and substantial evidence and in accordance with law" standard. Based on our review of the common pleas court's decision, we conclude the common pleas court applied the appropriate standard of review in denying JG's appeal.

*Morocho & Garcia Constr., L.L.C.*, 10th Dist. No. 23AP-397, 2024-Ohio-2241, ¶ 24. "An appellate court is not permitted to find an abuse of discretion merely because it would have arrived at a different result if it had reviewed the matter de novo." *Newsome v. Mt. Carmel Health Sys.*, 10th Dist. No. 05AP-169, 2005-Ohio-6853, ¶ 3. *See AAAA Ents. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990) ("A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.").

**B. Burden of proof at the administrative hearing**

{¶ 22} As an initial matter, because of some of the arguments JG presents, we find it worthwhile to clarify the burden of proof at the administrative level. Three of JG's four assignments of error assert that the Department erred by failing to award points for satisfying certain scoring criteria when scoring JG's application. In making those arguments, JG appears to suggest that the Department bore the burden of proof at the administrative hearing for explaining why points were denied for certain criteria. *See, e.g.*, Appellant's Brief at 46-47 (arguing the quality assurance scoring team members' testimony "does not justify any finding against JG, much less docking it the two points which would make the difference for its license"). In fact, however, JG bore the burden at the administrative hearing of proving that its application met the applicable requirements and that it was entitled to a processor provisional license. *See Solomon Cultivation*, 2021-Ohio-46, at ¶ 32 ("Solomon argues it was not its burden to prove its entitlement to a [medical marijuana cultivator level I provisional] license, or to disprove the department's basis for denying its application. We disagree, as the burden was on Solomon to demonstrate the department should have granted it the requested license."); *see also Lake Front Med., L.L.C. v. Ohio Dept. of Commerce*, 11th Dist. No. 2021-L-102, 2022-Ohio-4281, ¶ 10 ("Courts have held that a license applicant at an administrative hearing has the burden to demonstrate the department should have granted it the requested license.").

{¶ 23} We further note that within its fourth assignment of error, JG claims "[t]he Department had the burden to show that it complied with due process, using an even-handed scoring system and applied the same standards and legal interpretations to all."

(Appellant's Brief at 58.)   However, as the common pleas court noted, JG appears to misapprehend the burden of proof.  JG cannot merely allege a due process violation and then shift the burden to the Department to establish that JG's application was scored properly.  Instead, JG bore the burden of proving it was entitled to a processor provisional license.

{¶ 24} This court rejected a similar due process argument in *Solomon Cultivation*. In that case, an applicant for a medical marijuana cultivator provisional license appealed the denial of its application.  *Id*. at ¶ 2-3.  The application process for cultivator provisional licenses was similar to the processor provisional license application process that JG challenges in this case.  *See id*. at ¶ 10 (describing cultivator provisional license application process).  The applicant in *Solomon Cultivation* was denied a provisional license for failure to meet the minimum required scores on portions of its application.  *Id*. at ¶ 2.  On appeal, the applicant argued the Department violated its due process rights by denying its application.  *Id*. at ¶ 11.  The applicant claimed it was not sufficiently informed of the scoring process because scoring teams reached consensus in an undisclosed manner and because undisclosed criteria were used in the review of applications.  *Id*. at ¶ 14.  This court rejected the applicant's due process argument, concluding the scoring rules were reasonably definite and clearly outlined in the application instructions.  *Id*. at ¶ 15.  We further concluded the applicant "had notice of the factors the Department would consider in the application process and was provided the opportunity to present information in support of its application."  *Id*.  The notice of intent to deny the application detailed the deficiencies in the application and the applicant was given an opportunity to challenge the Department's decision at an administrative hearing.  Because the applicant was given notice and an opportunity to be heard, there was no due process violation.  *Id*. at ¶ 17.  Similarly in this case, JG was given notice and an opportunity to be heard, and the Department was not required to disprove a due process violation.

**C. Evidence issues**

{¶ 25} We begin by considering JG's evidentiary arguments, which JG presents in its first and fourth assignments of error.  In its fourth assignment of error, JG asserts the common pleas court erred by affirming the hearing officer's decision to quash subpoenas for copies of the applications submitted by winning applicants.  Also, as part of its first

assignment of error, JG argues the hearing officer erred by excluding the "N-series" exhibits it proffered at the hearing.

{¶ 26} "Generally speaking, '[a] hearing officer has broad discretion in accepting and rejecting evidence and in conducting the hearing in general.' " *Stancourt v. Worthington City School Dist. Bd. of Edn.*, 164 Ohio App.3d 184, 2005-Ohio-5702, ¶ 70 (10th Dist.), quoting *Crisp v. Scioto Residential Servs.*, 4th Dist. No. 03CA2918, 2004-Ohio-6349, ¶ 14. *See also Holzhauser v. State Med. Bd. of Ohio*, 10th Dist. No. 06AP-1031, 2007-Ohio-5003, ¶ 19 ("As a general rule, administrative agencies are not bound by the strict rules of evidence applied in courts."). Thus, a hearing officer has discretion to determine the admissibility of evidence. *Ohio Div. of Securities v. Treece*, 6th Dist. No. L-21-1191, 2022-Ohio-3267, ¶ 17, citing *In re Waste Technologies Industries*, 132 Ohio App.3d 145, 152 (10th Dist.1998). With respect to the issuance of subpoenas, the Supreme Court of Ohio has held that "a hearing examiner has the discretion to limit or quash subpoenas requested during adjudication hearings for the purpose of conducting a fair and efficient hearing." *Clayton v. Ohio Bd. of Nursing*, 147 Ohio St.3d 114, 2016-Ohio-643, ¶ 36. Therefore, we must determine whether the hearing officer's decision to quash the subpoenas was "so arbitrary that it constituted an abuse of discretion" or denied JG an opportunity to be heard in a meaningful manner. *Id*. at ¶ 37.

{¶ 27} JG asserts the "N-series" exhibits were security plan clarification score sheets for other applicants obtained through a public records request. JG argues the "N-series" exhibits would establish that the security scoring team applied Ohio Adm.Code 3796:3-2-05(A)(7) differently when scoring JG's application than when scoring other applications. JG further suggests that the scoring teams may have applied other criteria differently across different applications and argues that discovery of the winning applications was necessary to "test the uniformity of the grading standards." (Appellant's Brief at 59.)

{¶ 28} In opposition to JG's subpoenas, the Department argued that unredacted applications from the winning applicants were irrelevant to JG's appeal and that issuing the subpoenas would result in needlessly cumulative evidence and cause substantial and undue delay. The Department asserted the relevant issue in the appeal was whether JG's application contained the required information, not what was contained in the winning applicants' applications. Similarly, the Department asserted the "N-series" exhibits were

irrelevant because they only included the score sheets for certain applicants and not the security clarification plot plans those score sheets were affiliated with. Therefore, the Department argued, no conclusions could be drawn as to how the underlying plot plan compared to JG's plot plan.

{¶ 29} Under the circumstances here, we find no abuse of discretion in the hearing officer's decision to quash JG's subpoenas on the winning applicants or exclusion of the "N-series" exhibits. The issue in the hearing was whether JG's application had been properly scored and specifically JG's claims that it should have received additional points for satisfying certain criteria. Given that focus, it would be possible for JG to establish that its application was not properly scored without reference to the scores given to winning applicants. *See Buckeye Relief, L.L.C. v. State Bd. of Pharmacy*, 8th Dist. No. 109050, 2020-Ohio-4916, ¶ 29 ("The sole issue before the board was whether Buckeye Relief could demonstrate that the board abused its discretion in awarding other applicants a dispensary license over Buckeye Relief's application. Buckeye Relief demonstrated that the scoring process on question C-5.5 as applied to Buckeye Relief was in error. Buckeye Relief's argument does not fail because it is based on a review of its own application, to the exclusion of the other applicants who were awarded a license, or that there were only five available licenses for that particular district."). Therefore, we cannot conclude that it was unreasonable, arbitrary, or unconscionable for the hearing officer to limit JG's discovery by quashing JG's subpoenas on the winning applicants or to limit the scope of the hearing by excluding the "N-series" exhibits.

{¶ 30} Accordingly, we overrule JG's fourth assignment of error. We also overrule JG's first assignment of error to the extent it challenges the hearing officer's refusal to admit the "N-series" exhibits into evidence.

**D. Whether there was reliable, probative, and substantial evidence to support the hearing officer's conclusion that JG was not entitled to a change to the score on its security plan clarification score sheet**

**1. Whether JG was entitled to receive points for meeting Criteria 1 of the security plan clarification score sheet**

{¶ 31} In its first assignment of error, JG argues there was not reliable, probative, and substantial evidence to support the score it received on Criteria 1 of the security plan clarification score sheet. Criteria 1 of the security plan clarification score sheet evaluated

whether an applicant's security plan clarification plot plan "show[ed] access control devices." (State's Ex. Q at 1.) The score sheet stated that "[a]ccess control must be shown for all rooms or areas that require proper credentials to enter to receive 2 points." (State's Ex. Q at 1.) The score sheet indicated that Criteria 1 was based on Ohio Adm.Code 3796:3-2-05(A)(7). Ohio Adm.Code 3796:3-2-05(A)(7) provides that a processor must "[r]estrict access to any area within the facility containing plant material, medical marijuana extract, or medical marijuana products to all persons except licensed employees and agents or an individual permitted to access the facility under the supervision of a licensed employee or agent in accordance with the visitor authorization procedures set forth in [Ohio Adm.Code 3796:5-2-01]."

{¶ 32} JG was not awarded points for Criteria 1. JG's security plan clarification score sheet included the following comments from the scoring team regarding Criteria 1:

> Although the plot plan indicates that the dumpsters are locked, the plot plan does not show any access control equipment for the dumpster enclosure. In addition, the plot plan does not indicate the location of locked containers inside the building.

(State's Ex. Q at 1.)

{¶ 33} The hearing officer found that a security plan clarification plot plan was required to include all different areas of operation within a processing facility. Based on Bailik's testimony, the hearing officer found the security scoring team was unable to locate a waste and destruction area on JG's security plan clarification plot plan. Therefore, the security scoring team concluded JG's security plan clarification plot plan did not satisfy Criteria 1 because it did not show access control for a waste and destruction area. The hearing officer found the testimony of the scoring team members, including Bailik, to be very credible. Based on the evidence and testimony presented at the hearing, the hearing officer concluded JG failed to demonstrate by a preponderance of the evidence that it was entitled to a change to its score on Criteria 1 of the security plan clarification. On appeal, the common pleas court found that Bailik testified "at considerable length and in great detail, why her team awarded the scores it awarded" to JG's security plan clarification. (Decision & Jgmt. Entry at 11.) The common pleas court concluded that "[w]hile [JG] may disagree with Ms. Bailik's explanation of the scores that [JG] received for its Security Plan,

Ms. Bailik's testimony provides reliable, probative, and substantial evidence to support those scores." (Decision & Jgmt. Entry at 13.)

{¶ 34} JG argues the security scoring team erred by denying points for Criteria 1 based on a lack of access control for the dumpster enclosure shown on its security plan clarification plot plan. JG asserts its waste dumpsters were not required to meet the standards of Ohio Adm.Code 3796:3-2-05(A)(7) because that rule imposes limitations on areas containing "usable marijuana, not destroyed waste." (Appellant's Brief at 10.) JG argues that access to the "destroyed marijuana waste" to be placed in its dumpsters was governed by Ohio Adm.Code 3796:3-2-05(A)(2), which requires a processor to have fencing and gates preventing unauthorized access to waste disposal containers located outside a facility. JG claims its security plan clarification plot plan complied with Ohio Adm.Code 3796:3-2-05(A)(2), and that it should not have been penalized for failing to show access control to its dumpsters.

{¶ 35} JG's argument is narrowly focused on the security scoring team's comment regarding the lack of access control for its waste dumpsters. However, that narrow focus obfuscates the more complete explanation for denial of credit for Criteria 1 that Bailik provided at the hearing. Under Ohio Adm.Code 3796:3-2-03(C), "disposal of medical marijuana or medical marijuana products shall be performed by a type 1 employee in the designated destruction area identified in the processor's plans and specifications." The disposal must be "performed under video surveillance from the time the destruction begins to when it is placed in a locked dumpster or other approved, locked container and removed from the facility." Ohio Adm.Code 3796:3-2-03(C). Because of these requirements, applicants needed to demonstrate the location of a destruction area on their security plan clarification plot plans, with video surveillance and access limited to type 1 key employees. Criteria 7 of the clarification score sheet evaluated whether an applicant demonstrated the presence of a proper destruction area. JG's security plan clarification plot plan did not receive credit for Criteria 7.

{¶ 36} At the administrative hearing, Bailik explained the connection between JG's failure to show a destruction area and the security scoring team's conclusion that JG's security plan clarification plot plan failed to show access control devices as required by Ohio Adm.Code 3796:3-2-05(A)(7):

Q: Turning to Criteria 1 * * *.  Can you say what it is that [JG] was lacking that caused it to get a zero?

A: Item 1 on the Processor Clarification Review Score Sheet, * * * line item 1 did not comply based upon the following: "Although the plot plan indicates that the dumpsters are locked, the plot plan does not show any access control equipment for the dumpster enclosure. In addition, the plot plan does not indicate the location of locked containers inside the building."

Q: Can you explain why that shows we shouldn't get 2 points?

A: Because you needed to provide access control to waste and destruction and you needed to provide access control to any location that housed medical marijuana or anything similar to medical marijuana. So if you don't show access control, then we have to assume there is none.

(Tr. Vol. I at 70-71.)  Bailik stated that "[w]hat we tried to do was find the access control for all the items that are needed and that includes the vault, waste and destruction, surveillance." (Tr. Vol. I at 72.)  Under additional questioning, Bailik explained further:

Some applicants showed waste and destruction out at the dumpsters in compliance with the rules with access control. Some applicants showed waste and destruction and locked containers inside the building under access control.

And so this reasoning right here is our reasoning trying to find what you mean by that. If you look down at item 7 on this same score sheet, "The plot plan does not show the location of a designated destruction area. . . ." So this reasoning is to show you that we looked at your plot plans.

We tried to find what was meant by waste and destruction. We evaluated the dumpster location; did that comply, no. We looked at your floor plans and from my notes here we didn't find any waste and destruction area designated on your floor plan.

So what this does is because access control must be provided for all rooms and spaces that contain medical marijuana and so when we -- this is to show you how we evaluated that and, because we couldn't find that, it is unclear whether access control is being provided.

(Tr. Vol. I at 73.) Bailik again reiterated the security scoring team's reasoning later in her testimony:

> [W]e were looking for waste and destruction, and I'm telling you we're going through this and that was our thought process and since waste and destruction needed access control -- so No. 7 says "Does the plot plan show the location of the destruction area?" No. So how do you get credit for access control if you don't show the location of one of the prime areas referenced in the rule with regard to levels of access?

(Tr. Vol. I at 78-79.) Later in her testimony, Bailik again explained the security scoring team's rationale:

> In light of this competitive process, we did try to look for what we needed and, based on how these plot plans were laid out, we were unable to locate access control for all rooms and spaces that contained medical marijuana products.
>
> And I think, on the contrary, if you had shown -- if you achieved No. 7 then that would pass the filter, but if you didn't show access control, for instance for a door into the building, which we saw on occasion, so access control is the umbrella item, do you show access control at every door, space, containing medical marijuana. It doesn't have to be correct access control, it just has to be access control.
>
> So what we tried to do was give credit in stair steps like baby steps, so if you showed -- because it doesn't say access control has to be correct, it just says access control must be shown for all rooms in the areas.
>
> So our position was if you showed access control at all rooms and spaces that contained medical marijuana, regardless if it was correct, we gave you 2 points.
>
> In this case when you failed to show one of the rooms that are listed are restricted to Type 1 Key employees, we have no basis to award you points because we don't see access controls for that room or space.

(Tr. Vol. I at 83-85.)

{¶ 37} Because medical marijuana or medical marijuana products must be brought into a designated destruction area for the purposes of destruction, the destruction area is necessarily an "area within the facility containing plant material, medical marijuana

extract, or medical marijuana products." Ohio Adm.Code 3796:3-2-05(A)(7). Thus, in addition to the requirements of the destruction rules, a processor also would be required by Ohio Adm.Code 3796:3-2-05(A)(7) to restrict access to the destruction area.

{¶ 38} As noted above, Criteria 1 of the security plan clarification score sheet provided that "[a]ccess control must be shown for all rooms or areas that require proper credentials to enter to receive 2 points." (State's Ex. Q at 1.) Notwithstanding the reference to access control for the dumpster enclosure in the comments on the security plan clarification score sheet, Bailik's testimony establishes that JG was not denied credit for Criteria 1 due to failure to provide access control for dumpsters containing *post-destruction* waste. Rather, JG failed to establish the location of a destruction area where medical marijuana or medical marijuana products would be brought for destruction by a type 1 key employee. Because the destruction area would contain medical marijuana before it was destroyed, JG's failure to demonstrate a waste and destruction area also necessarily constituted a failure to demonstrate that it would "[r]estrict access to any area within the facility containing plant material, medical marijuana extract, or medical marijuana products," as required by Ohio Adm.Code 3796:3-2-05(A)(7). The security scoring team could not locate JG's waste and destruction area; accordingly, the security scoring team denied JG credit for Criteria 1 because it could not determine that JG had access control to limit access to such an area.

{¶ 39} Alternatively, JG argues its security plan clarification plot plan complied with Ohio Adm.Code 3796:3-2-05(A)(7) because the waste dumpsters were enclosed within the perimeter fence surrounding the entire facility, which was equipped with access control to limit access to the facility. JG's security plan clarification plot plan depicted an eight-foot-tall chain-link fence topped with barbed wire around the perimeter of the facility. The plot plan also depicted entry access control outside the gate leading into the facility. Bailik admitted in her testimony that access control at the main gate were a form of access control.

{¶ 40} Ohio Adm.Code 3796:3-2-05(A)(2) requires a processor to "[m]aintain or construct fencing and gates that surround the facility to prevent unauthorized entry to the facility or unauthorized access to waste disposal containers located outside the facility." Compliance with that requirement was assessed through Criteria 5 of the security plan clarification score sheet; JG's security plan clarification received two points for compliance

with that requirement. As explained above, Criteria 1 tested compliance with Ohio Adm.Code 3796:3-2-05(A)(7), which requires a processor to restrict access to areas *within* a facility containing plant material, medical marijuana extract, or medical marijuana products. JG fails to establish that the presence of a perimeter fence *surrounding* its facility also served to limit access to areas *within* JG's facility for purposes of compliance with Ohio Adm.Code 3796:3-2-05(A)(7).

{¶ 41} In her testimony, Bailik explained the scoring system generally and explained how the security scoring team applied the scoring system in evaluating JG's security plan clarification. She explained the basis for the security scoring team's conclusion that JG failed to establish that it would restrict access to all areas within its facility containing plant material, medical marijuana extract, or medical marijuana products, in compliance with Ohio Adm.Code 3796:3-2-05(A)(7). Based on our review of the evidence and testimony presented at the hearing, we cannot conclude that the common pleas court abused its discretion by finding there was reliable, probative, and substantial evidence to support the hearing officer's conclusion that JG was not entitled to a change in its score on Criteria 1 of the security plan clarification score sheet. *See JG City*, *L.L.C. v. Ohio Bd. of Pharmacy*, 10th Dist. No. 21AP-38, 2021-Ohio-4624, ¶ 33 ("In this case, there was testimony from Reed explaining the scoring system generally, and testimony from Williams and Wai explaining how they applied the scoring system in evaluating applications. Under these circumstances, the trial court did not abuse its discretion by finding that the Board's order was supported by reliable evidence."). Accordingly, we overrule JG's first assignment of error.

**2. Whether JG was entitled to receive points for meeting Criteria 8 of the security plan clarification score sheet**

{¶ 42} In its second assignment of error, JG argues there was not reliable, probative, and substantial evidence to support the score it received on Criteria 8 of the security plan clarification score sheet. Criteria 8 of the security plan clarification score sheet evaluated whether an applicant's security plan clarification plot plan "show[ed] that the surveillance room is a dedicated room in accordance with the rule." (State's Ex. Q at 3.) The score sheet indicated that Criteria 8 was based on Ohio Adm.Code 3796:3-2-05(A)(4)(b).

{¶ 43} The department's processor security rules require a processor to "[m]aintain all security system equipment and video surveillance systems in a secure location so as to prevent theft, loss, destruction, or alterations." Ohio Adm.Code 3796:3-2-05(A)(4). The rules further require a processor to limit access to surveillance areas to specified individuals, including "type 1 key employees that are essential to surveillance operations" and to provide a list of those type 1 key employees that have access to the surveillance room to the department on request. Ohio Adm.Code 3796:3-2-05(A)(4)(a) and (b). Additionally, "[a] processor shall keep all on-site surveillance rooms locked and shall not use such rooms for any other functions." Ohio Adm.Code 3796:3-2-05(A)(4)(b).

{¶ 44} The department's rules also set forth minimum requirements for a processor's video surveillance recording system, including "[a] display monitor with a minimum screen size of twelve inches * * * connected to the electronic recording security system at all times." Ohio Adm.Code 3796:3-2-05(B)(4)(b).

{¶ 45} JG was not awarded points for Criteria 8. JG's security plan clarification score sheet included the following comments from the scoring team regarding Criteria 8:

> The plot plan does not show the location of a surveillance room and the security room is not a dedicated room, as it is also used to check in visitors. In addition, the IT room does not have monitors, so this room could not be used as a surveillance room.

(State's Ex. Q at 3.)

{¶ 46} Based on Bailik's testimony, the hearing officer found that the security scoring team was unable to find a surveillance room on JG's security plan clarification plot plan. The hearing officer found that JG's security plan clarification plot plan contained conflicting information about the location of the surveillance room, and the security scoring team concluded it did not satisfy Criteria 8 because it was unable to resolve the conflict and identify a surveillance room. As noted above, the hearing officer found Bailik's testimony to be very credible. Based on the evidence and testimony presented at the hearing, the hearing officer concluded JG failed to demonstrate by a preponderance of the evidence that it was entitled to a change to its score on Criteria 8 of the security plan clarification. On appeal, the common pleas court concluded that "[w]hile [JG] may disagree with Ms. Bailik's explanation of the scores that [JG] received for its Security Plan, Ms. Bailik's testimony

provides reliable, probative, and substantial evidence to support those scores." (Decision & Jgmt. Entry at 13.)

{¶ 47} JG argues the security scoring team erred by denying points for Criteria 8 because its surveillance equipment was contained in a dedicated room designated as the "IT Closet" on its security plan clarification plot plan. JG asserts the security scoring team incorrectly concluded that the IT Closet could not serve as the surveillance room required by rule because it lacked a computer monitor.

{¶ 48} JG's security plan clarification plot plan indicated that three areas inside its facility would be classified as "Restricted – Level 4" with access limited to type 1 key employees with appropriate clearance. Those three areas were designated as "Security," "IT Closet," and "Vault." Bailik testified the security scoring team concluded that although the area designated as "Security" contained computer monitors, it did not satisfy the requirements of the rules because it was a multi-purpose area also used to check in visitors. JG has not argued that the "Vault" area could serve as the surveillance room; therefore, JG's only argument is that the "IT Closet" satisfied the requirements for a surveillance room.

{¶ 49} Bailik testified the security scoring team concluded the IT Closet did not satisfy the requirements of the rules because it did not contain a computer monitor connected to the security system. Bailik admitted that JG's security plan clarification plot plan indicated the security system recording equipment would be located in the IT Closet, but noted that monitors were only shown in the Security area. Bailik asserted it was necessary for a processor to have a computer monitor in the dedicated surveillance room to comply with the processor security requirements:

> Q: In looking at the IT closet, how did you determine that was not a viable room for the surveillance room?
>
> A: It didn't have -- it didn't show any equipment like monitors for instance. To me, you know, the Administrative Code comes up with surveillance room but surveillance, as far as I know, is the act of surveilling, you're looking and you have something that is a viewer.
>
> And they clearly know what monitors are because they show them in the security room so it's not like they don't know how to show a monitor. They show them in the security room but there's nothing to show us the IT closet is anything more than just an IT closet.

(Tr. Vol. I at 193-94.)  Bailik further explained how the security scoring team addressed conflicting information in a plot plan:

> Q: And in situations where there's conflicting information, so in this particular case the security room had a monitor but the IT closet didn't, the security room had a teller window or was used for dual purposes; if there's conflicting information, how did your team treat that?
>
> A: We treated it that we could not take a leap of faith on what was true. So, if it conflicted, is it the first item they mean or is it the second item they mean? We did not give them credit. It was competitive. We had to --we felt it was important that they be consistent.
>
> Q: And was the duty on you, as a scoring team, to find things, or was the duty on the applicant to demonstrate compliance with the rules?
>
> A: It was on the applicant to prepare an application that was compliant with the rules.
>
> Q: And if you felt they did not demonstrate that to either you or the scoring team, did you grade them accordingly?
>
> A: Yes.

(Tr. Vol. I at 201-02.)

{¶ 50} On appeal, JG asserts it was unreasonable for the security scoring team to expect it to depict a 12-inch monitor in the IT Closet on its security plan clarification plot plan.  However, the details included in other areas of JG's security plan clarification plot plan belie JG's claim that it would be unreasonable to expect a monitor to be shown in the IT Closet.  JG's security plan clarification plot plan clearly depicts a dual monitor closed-circuit viewing station located in the security room, and other small items, such as keycard readers and surveillance cameras, are noted throughout the plot plan.  JG could have depicted a monitor inside the IT Closet, as it did in the security area, but simply failed to include this detail on its security plan clarification plot plan.

{¶ 51} JG further argues that its original security plan narrative, submitted as part of its initial application, indicated there would be a monitor located in the IT Closet, thereby establishing compliance with the surveillance system requirements.  At the hearing, Bailik

testified that the narrative description included in JG's original security plan narrative "adequately described a room that was available to act as their surveillance room." (Tr. Vol. I at 28.) However, Bailik further testified that the security scoring team did not rely on applicants' original security plan narratives when scoring clarification submissions because the clarification request superseded the security plans included in the applicants' original applications. JG asserts the clarification submission was not intended to supersede the original security plan narrative. Thus, JG effectively argues the department erred by failing to consider the narrative portion of its original security plan when scoring the security plan clarification.

{¶ 52} The Department's request for clarification explained the purpose and process for the clarification submission:

> In order to award additional licenses in a second round of scoring, the Department seeks to clarify and confirm certain elements of your organization's proposal. This request will supersede the original application instructions -- and the score based on the clarification response will supersede any prior score -- with regard to the Security Plan of the processor application. However, applicants will still be bound by any enhanced security features or other optional security elements described in their original applications.

(Footnote omitted.) (Oct. 3, 2018 Dept. of Commerce Letter, State's Ex. O at 1.) Applicants were required to affirm that they intended to comply with the requirements set forth in specified provisions of the Administrative Code and to submit a facility plot plan with the elements of the applicable rules, including Ohio Adm.Code 3796:3-2-05, delineated.

{¶ 53} The Eighth District Court of Appeals recently rejected a claim that the Department erred by failing to consider an applicant's original security plan narrative when scoring a clarification submission. *Ascension Biomedical, L.L.C. v. Ohio Dept. of Commerce*, 8th Dist. No. 111676, 2023-Ohio-469. The court concluded that the plain language of the clarification request notified applicants that their clarification score would supersede their original security plan score and instructed that the clarification submission needed to include the elements required under the Administrative Code. *Id.* at ¶ 52. The Eighth District also rejected the argument, similar to the one proffered by JG in this appeal, that the original security plan narrative should have been considered during clarification

scoring because the clarification instructions stated that applicants remained bound by any enhanced or optional security features included in their original applications:

> That [an applicant] would still be "bound by" previous requirements in its original application does not, without a specific statement, equate to those elements being part of the scoring system for the clarification request. Because the department was mainly concerned about security issues with the applicants who did not get licensure in the initial application phase, it would make sense that those applicants would "still be bound by any enhanced security features or other optional security elements described in their original applications." But that language does not equate to a pronouncement that the original applications would be considered in the clarification phase.

*Id.* at ¶ 54. The court further reasoned that because the applicant's original security plan had been deemed deficient, "it would seem nonsensical that the department would refer to it for scoring purposes during the clarification process." *Id.* at ¶ 56. We agree with the Eighth District's reasoning and conclude that the security scoring team did not err by not considering JG's original security plan narrative when scoring its security plan clarification plot plan.

{¶ 54} Bailik's testimony explained the elements of the surveillance system that the security scoring team sought to identify and why they concluded JG failed to demonstrate the presence of a surveillance room satisfying the requirements of the rules. Based on our review of the evidence and testimony presented at the hearing, we cannot conclude that the common pleas court abused its discretion by finding there was reliable, probative, and substantial evidence to support the hearing officer's conclusion that JG was not entitled to a change in its score on Criteria 8 of the security plan clarification score sheet. *See JG City*, 2021-Ohio-4624, at ¶ 33. Accordingly, we overrule JG's second assignment of error.

**E. Whether there was reliable, probative, and substantial evidence to support the hearing officer's conclusion that JG was not entitled to a change to the score on its quality assurance plan score sheet**

{¶ 55} In its third assignment of error, JG argues there was not reliable, probative, and substantial evidence to support the score it received for its quality assurance plan. JG argues the quality assurance scoring team erred by concluding that its quality assurance

plan failed to demonstrate that it would employ disposal methods that would not pose a contamination risk.

{¶ 56} The quality assurance plan was required to establish policies for a safe, consistent supply of medical marijuana, including "[s]tandards for the disposal of medical marijuana waste and other wastes." Ohio Adm.Code 3796:3-1-02(B)(4)(g). The score sheet used by the quality assurance scoring team required reviewers to evaluate six criteria in the category of "[d]isposal and [w]aste [r]emoval," including whether a plan included "[d]isposal methods that will not pose a contamination risk." (State's Ex. I at 5.) The quality assurance plan score sheet for JG's application indicates the scoring team found five of the six criteria satisfied but found that JG's quality assurance plan failed to demonstrate waste disposal methods that would not pose a contamination risk. Therefore, the quality assurance scoring team awarded JG three points on that subsection of the score sheet, which corresponded to the conclusion that the "[p]lan addresses all of the required elements established in rule and adequately demonstrates 3-5 of the elements above, inclusive of the required elements." (State's Ex. I at 5.) The quality assurance scoring team's general comments indicate the team found that JG's quality assurance plan contained "minimal detail no additional features." (State's Ex. I at 5.)

{¶ 57} Based on the hearing testimony, the hearing officer found that the quality assurance scoring team was unable to find protocols to prevent contamination by waste material in JG's quality assurance plan. The hearing officer found the testimony of the quality assurance scoring team members to be very credible. Based on the evidence and testimony presented at the hearing, the hearing officer concluded JG failed to demonstrate by a preponderance of the evidence that it was entitled to a change to its score on its quality assurance plan. On appeal, the common pleas court concluded that the quality assurance scoring team members testimony explained the scores JG received on its quality assurance plan.

{¶ 58} The quality assurance plan score sheet did not contain any notes or comments specifically explaining the scoring team's decision that JG's quality assurance plan did not demonstrate disposal methods that would not pose a contamination risk. JG called Gerhardt, Kenny, and Zapadka to testify at the hearing regarding the scoring team's conclusion that JG's quality assurance plan failed to demonstrate disposal methods that

would not pose a contamination risk. JG argues those witnesses' testimony was inconsistent and contradictory, and that it failed to demonstrate reliable, probative, and substantial evidence to support the quality assurance plan score.

{¶ 59} Gerhardt testified that "when it came to the disposal section, [applicants] were to address, in some manner, that they were cognizant of a contamination issue, that they would prevent that." (Tr. Vol. II at 357.) She asserted JG's quality assurance plan did not specifically state that its disposal "methods would protect either other cannabis, other food products, products in storage, it was not addressed." (Tr. Vol. II at 324.) In her testimony, Gerhardt gave examples of why she concluded JG's quality assurance plan failed to demonstrate disposal methods that would not pose a contamination risk:

> A. I would need to see more on the handling of the product and identifying and being proactive and saying we will ensure the product will be handled in a manner --
>
> * * *
>
> A. [L]et's say you were making cupcakes and you burnt them all. That is now waste that you need to dispose of. Or maybe it all fell on the floor and it's contaminated in that manner. How are you going to ensure, and there's multiple levels, that that product is going to be handled, that it is disposed of, and that handling that is not going to contaminate any other product which also falls to sanitation. Are you picking it up with your hands and then you're going to go over and manipulate good product?
>
> Q: So you have to take product that should be treated as waste and treat it as waste so it doesn't commingle with good product, correct?
>
> A: Not even the product itself but how you handled it. You don't think it has to do with sanitation but it does because even if you're wearing --this is something that happens in food manufacturing all the time --people wear gloves to dispose of waste, whatever might have caused that waste, and then if they don't change those gloves or wash their hands, they've now contaminated good product.
>
> We're just looking for how are you going to make sure that it doesn't adulterate or provide a vehicle for adulteration of other product. And you can have contamination not just of direct

> product but of packaging if you don't have good processes to
> deal with waste.

(Tr. Vol. II at 334-35.)  When asked whether her primary concern involved food handling practices, Gerhardt responded:

> A. It wasn't necessarily just food handling. It was just the fact
> they did not address, make any statement alluding to the fact
> they were going to dispose of product in a manner that would
> not pose a contamination risk.

(Tr. Vol. II at 342.)   When questioned about JG's practices to isolate and destroy contaminated products, Gerhardt explained that simply isolating contaminated batches was not sufficient to prevent possible contamination:

> A. Commingling and preventing contamination are not the
> same thing.  Commingling is I have good product A and I have
> good product B but, because of record keeping, I am not going
> to be mixing those two. That has nothing to do with
> contamination and disposal efforts as I read it.
>
> * * *
>
> Q. Okay.  Can you give me a specific explanation of how it could
> be, in your opinion, that there would be contamination from
> the bad batch to any other batch?
>
> * * *
>
> A. If they have bad product for whatever reason and it's not
> handled in a manner that contains, for lack of a better word,
> the badness of that product, be it a pathogen, a pesticide, in the
> production of that product and in the moving of that product
> to a locked entity, box, whatever they're using, there could be
> contamination issues in handling the adulterated product. And
> then, in turn, the adulterated product, if you process it, you
> could have a problem.
>
> But the handling of it is also a problem.  How are you getting it
> to move.  There could be contamination issues there because
> your hands could be the vessels you use to move the product if
> you also then use it for good product.

(Tr. Vol. II at 361-63.)

{¶ 60} Although Kenny did not recall the specific reasons the quality assurance scoring team found that JG's application failed to demonstrate disposal methods that would not pose a contamination risk, he testified that "I think the overall absence of detail in describing methods that will, you know, eliminate or address risk for contamination would be the reason, one of the major reasons why." (Tr. Vol. II at 467.) Similarly, Zapadka testified that JG's application "didn't fully describe how the organization was going to maintain, not only in the facility or partly in the facility, how they were going to maintain separate waste for contaminated versus non-contaminated." (Tr. Vol. II at 541.)

{¶ 61} JG argues these witnesses failed to cite any portion of JG's quality assurance plan that created a risk of contamination to support the quality assurance scoring team's conclusion. However, all three witnesses testified consistently that JG's quality assurance plan provided insufficient detail explaining how JG's practices would avoid or mitigate potential contamination risks. Moreover, Gerhardt provided several hypothetical methods of contamination as examples of the type of detail the quality assurance scoring team sought in JG's quality assurance plan. Based on our review of the evidence and testimony presented at the hearing, we cannot conclude that the common pleas court abused its discretion by finding there was reliable, probative, and substantial evidence to support the hearing officer's conclusion that JG was not entitled to a change in its score on the quality assurance plan score sheet. *See JG City*, 2021-Ohio-4624, at ¶ 33. Accordingly, we overrule JG's third assignment of error.

## IV. Conclusion

{¶ 62} For the foregoing reasons, we overrule JG's four assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and BOGGS, JJ., concur.